249 P.3d 264 (2011)
PRAVAT P., Appellant,
v.
STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.
No. S-13798.
Supreme Court of Alaska.
February 18, 2011.
*265 Christi A. Pavia, Pavia Law Office, Anchorage, for Appellant.
Megan R. Webb, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.
Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

OPINION
CARPENETI, Chief Justice.

I. INTRODUCTION
A Laotian father challenges the termination of his parental rights to his three boys who qualify for protection under the Indian Child Welfare Act. The superior court found the children to be in need of aid due to a history of domestic violence and neglect. It found (1) that the father had not remedied his conduct, (2) that returning the children to the father's custody would likely result in serious emotional or physical damage, (3) that termination of parental rights would be in the best interests of the children, and (4) that the State made active efforts to reunify the family. Because on appeal the father has not shown clear error in the superior court's factual findings, and because these findings meet the evidentiary thresholds required by Indian Child Welfare Act and Alaska's Child in Need of Aid statutes and rules, we affirm the superior court's termination of the father's parental rights.

II. FACTS AND PROCEEDINGS

A. Facts
Pravat[1] was born in Laos in 1957 and immigrated to the United States in 1981. He is the father of three boys who are "Indian children" under the terms of the Indian Child Welfare Act (ICWA).[2] Mark and Jung were born in 2001 and 2002, respectively, to Molly, a Native Alaskan who died in 2007. Reese was born in 2006 to Stella, a Native Alaskan who relinquished her parental rights in 2008. Only Pravat's parental rights are at issue in the present case.
*266 All three of the children have experienced serious developmental delays and other health problems. Molly, who died of alcohol poisoning in 2007, used alcohol and drugs while she was pregnant with Mark and Jung. Mark has been diagnosed with static encephalopathy, a non-progressive brain dysfunction which impairs his cognitive and motor functions. He also has Post-traumatic Stress Disorder and Oppositional Defiance Disorder. He has a history of intestinal blockages, possibly due to poor nutrition while in his father's care. He has trouble sleeping, and his doctor's testimony suggested that Mark hallucinates. He also has a history of sexually acting out, including inappropriate behavior with his foster parents' pets, his brothers, and other children.
Like Mark, Jung has static encephalopathy, various behavioral disorders, and bowel problems. There is also evidence in the record of Jung grabbing women's breasts, smearing feces on the wall, exposing his genitals, and placing his finger in Mark's bottom.
Stella, Reese's mother, was also diagnosed with Fetal Alcohol Spectrum Disorder. She was a teenage babysitter when Pravat impregnated her. She has admitted to a problem with alcohol and cocaine, and Pravat stated to Cook Inlet Tribal Council that he cut crack cocaine for her. But it is unclear whether she exposed Reese to alcohol or drugs in utero. When Reese was first removed from Pravat's custody in 2006, he showed "obvious signs of neglect." The back of his head was flat from lying on his back much of the time rather than being held. The shape of Reese's head began to improve during his time in foster care. Reese also has been diagnosed with Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder. All three boys have Individualized Education Plans in their respective schools to address their special needs.
Pravat's children have a long history of involvement with the Office of Children's Services (OCS). Shortly after Jung's birth in 2002, Pravat came home to find that Molly was drunk and had severely beaten Mark and Jung. Pravat then hit her. The children were hospitalized for several days due to head injuries. Jung had suffered multiple facial lacerations, contusions on his face and scalp, a retinal hemorrhage, and a subdural hematoma. The children were released to Pravat's sole physical custody, although OCS continued to supervise the family until 2004. Once OCS closed the case, government services were discontinued because of Pravat's failure to follow through with efforts to improve his children's home environment.
In May 2005 OCS received a report alleging that "the living conditions of [Pravat's] home were unsuitable for children." The report stated that the home "did not have a working toilet and the children are frequently sick." In February 2006 OCS received a "Child at Risk" report from the Alaska Native Medical Center. The report stated that Mark and Jung were dirty, with a "breakdown to skin due to prolonged contact [with] stool." It also stated that the "father [is] unable to care for children appropriately."
In 2006 Mark underwent a psychological assessment following an OCS referral. The examiner reported:
[Pravat] reports experiencing a significant amount of stress in parenting [Mark]. Nothing about this child was noted to be positive. Instead, his father is feeling trapped by parenting responsibilities, cut off from access to friends and adult social activities, and generally "not very good at being a parent." . . . This level of distress indicates a significant Parent-Child Relational Problem.
Reports from Cook Inlet Tribal Council confirmed that Pravat lacked parenting skills and was overwhelmed as the primary caregiver.
In the months after Reese's birth in January 2006, police responded to multiple reports of domestic violence in the home. In February 2006, Pravat alleged that Stella broke into his home wielding a knife and attempted to take Reese away. Police were called again to the home a few days later. Pravat claimed Stella threatened to kill herself, and he had restrained her to prevent her from doing so. Stella claimed she had wanted to leave, but Pravat grabbed her to stop her. All three children were present during the incident. Pravat received a protective *267 order against Stella, which Stella violated.
On June 20, 2006, police were called to Pravat's home once again. Officers found Stella tied up on the floor, her wrists and ankles bound by belts, and her overalls pushed down to her thighs. Pravat was sitting on the couch and Reese was in a car seat next to him. Jung and Mark were also at home. Pravat claimed that Stella had been drinking and became violent, kicked one of the children in the head, threw things around the house, and at one point tried to run away. He stated that he had dragged her back into the home and tied her up to prevent her from harming the children. Stella claimed Pravat had forced her into his car with the children inside, drove her to his home, and began giving her alcohol and saying he wanted to have sex with her. According to Stella, when she tried to leave, Pravat dragged her back into the apartment and told her he was going to rape her. A neighbor witnessed Pravat pulling Stella back into the apartment by her feet and heard her scream, "Let me go."
Pravat was arrested and charged with kidnaping, assault in the fourth degree, and interfering with a report of a crime involving domestic violence. He pled guilty to the charges of coercion and assault in the fourth degree and was incarcerated from June 2006 until March 2007. OCS contacted Pravat while he was at a pretrial detention facility, but it did not initially engage him in a case plan. As reasons for its delay, OCS cited both communication barriers as well as its practice of deferring work on case plans until incarcerated parents are out of jail or transferred to their long-term prison. A number of barriers made communication with Pravat difficult, including his limited English, bilateral hearing loss, and a diagnosed panic disorder.
Once OCS began visitations between the children and Pravat, the boys were so aggressive that the guardian ad litem asked OCS to get an opinion on whether visits should be discontinued. The clinician felt that stopping visits would harm the children even more, so visits continued.
Cook Inlet Pre-trial Facility obtained a hearing aid for Pravat while he was incarcerated, but he did not wear it. Sandra Dehart, Pravat's caseworker, met with him in September 2006 to explain his case plan. In December Dehart returned with an interpreter to discuss the case plan again. In February 2007 Dehart mailed a letter to Pravat containing his case plan and a list of referral agencies. After his release from prison, Pravat met with Dehart again to discuss the case plan and visitation schedule.
In May 2007 OCS created a new case plan for Pravat. OCS also created a simplified, one-page, bulleted version that would be easier for Pravat to understand. OCS continued to work with Pravat to assist with his communication needs, including trying to obtain a second hearing aid for him. Weekly visits between Pravat and the children originally took place at OCS. During these visits, the boys continued to display hyperactivity and aggressiveness, hitting Pravat and not listening to him. Pravat often did not intervene to stop them. In July 2007 OCS changed the location of the visits to the Eklutna Child Advocacy Center (Eklutna Center).
In September 2007 OCS filed a permanency plan with the court. In this plan, Pravat's social worker referred to the difficulties she faced discussing his case plan with him due to the communication barriers. OCS's reunification efforts were delayed due to Pravat's incarceration and hearing issues. In particular, OCS deferred "almost everything in the case plan" until Pravat could be given a psychological assessment, a process that "took months" partly due to linguistic and cultural difficulties.
In March 2008 Dr. Michael Rose performed the psychological and parenting assessment on Pravat. Dr. Rose concluded in his assessment that Pravat "consistently paints himself as the victim of circumstances or other persons." In Dr. Rose's opinion,
[Pravat] maintains an extraordinarily defensive posture, resisting efforts to encourage him to make changes in his behavior or to see how his choices have negatively affected his children's safety and welfare. He also appears to minimize the problems his children now have, believing they are *268 primarily related to lack of contact with him.
Ultimately, Dr. Rose concluded that "it is unlikely [Pravat] has the parenting capacity or ability to currently care for his children, and his prospects for being able to parent his children in the future appear less than favorable."
Even after OCS succeeded in finding an interpreter fluent in Laotian, Pravat continued to have problems complying with the case plan. The Eklutna Center referred visits back to OCS in March 2008 due to Pravat's excessive number of missed visits and the Eklutna Center's lack of capacity for dealing with the severity and complexity of the family's problems. To help Pravat better understand his sons' needs, OCS arranged for him to receive education from the Anchorage Community Mental Health Center (Anchorage Center). OCS agreed to pay for an interpreter for at least the first of these meetings. But Pravat stated on at least three occasions at this meeting that he did not need family therapy. "[M]y sons are fine when they are with me, they are smart," he stated. Anchorage Center told OCS that it was "not interested in trying to convince [Pravat] that there is something wrong with the children."
OCS made various attempts to accommodate the cultural and linguistic difficulties in Pravat's case, including by reaching out to Laotian and Thai temples in Anchorage and by paying for a translator for case planning, legal meetings, and court proceedings. In the summer of 2008 Pravat began attending classes for help with managing his emotions and with parenting, and OCS provided an interpreter for these meetings. OCS also reached out to a Buddhist priest for help in understanding Pravat's cultural differences. But the priest told OCS that the Laotian/Thai Buddhist way of dealing with matters was not "to deny or to avoid telling others or asking for help." Like the Eklutna Center and the Anchorage Center, the priest also emphasized that if someone "didn't want the help," the Buddhist community "could not force them."
In September 2008 OCS arranged for Pravat to meet with two monks from the Buddhist temple. The monks found Pravat to be extremely difficult to work with due to his defensiveness and refusal to listen. When one monk tried to tell Pravat about his children's special needs, Pravat stated, in the words of the OCS report, that his children
had no problem with him; when they lived with him they were smart and they would do what he said and [Mark] was good when he started school, it[']s just now that there are problems because they are away from their dad and because the state is making them take medication.
OCS asked the monks for a recommendation of a local therapist who had been successful with others of Laotian descent. But Pravat refused, without explanation, to meet with the person the monks recommended.
Meanwhile, Pravat's case workerMiriam Sumner as of November 2007reported that Pravat continued to poke and prod the boys "like a doctor exam" during his visits, despite being told not to do so. Pravat also continued to refuse to wear his hearing aid.
By October 2008 Pravat had completed 24 hours of a life skills course at the Buddhist temple, as well as courses on emotion management, parenting, and how to understand brain-based disorders. OCS also tried to get Pravat into training about Fetal Alcohol Spectrum Disorder. When OCS asked the instructor whether Pravat had been attending the classes, the instructor responded that Pravat "showed up for both classes" and "did understand the impact of alcohol on a dev[eloping] fetus, but was not sure he believed that this is the cause of his sons' delays. He commented several times that the boys were slapped hard by Mom and that's why they have problems." A clinician who interviewed Pravat in December 2008 noted that "[o]ver the past six months the patient has attended parenting classes and FASD awareness but it appears it has made very little difference in his parenting and visitation." The clinician continued:
[Pravat] refuses to acknowledge any problem with himself. He blames all of the trouble and problems on his previous female relationships and on the social workers and on miscommunication. He would *269 like to attend meetings with us and attend counseling in order to help him get his children back. He says he wants to change and work hard to do so; however, [he] does not acknowledge in what ways he needs to change.

B. Proceedings
On January 5, 2009, OCS filed its termination petition.
In preparation for the termination proceedings, Pravat's lawyer referred him to Dr. Nan Truitt for another psychological evaluation; she completed her report in April 2009. Dr. Truitt partially explained Pravat's minimization and denial of his children's disabilities as resulting from his minimal contact with his children and his difficulties communicating with them "[a]fter three years in a foster home that did not promote exposure to Lao culture, language, and Budd[h]ism spiritual training." Dr. Truitt recommended that "reunification continue to be the goal as it seems that the reunification plan was inadequate, delayed for various reasons, and the Federal Guidelines should be reconsidered in light of these delays."
In May 2009, Pravat filed a motion for continuance of the termination trial and renewed a request to transfer visits with his children to Cook Inlet Tribal Council. OCS offered various reasons for opposing transferring visits to Cook Inlet Tribal Council, including that the visitation supervisor there, Judd Bunag, was not trained in the "1-2-3 Magic" program,[3] a program recommended by the boys' therapists that was designed to manage the boys' behavior, and that it was not Bunag's job to oversee visits. The visits ultimately moved to Cook Inlet Tribal Council in July 2009. Bunag testified to improvements in Pravat's understanding of his children's needs after the transfer.
OCS and Pravat's attorney referred Pravat to Dr. Alfred Collins for a final parenting evaluation, which he completed in the fall of 2009. Dr. Collins met with the family from August until November in various combinations. The boys by this time were eight, seven, and three, and had been out of Pravat's custody for over three years. Dr. Collins observed that Pravat
denies the psychiatric and behavioral problems that professionals have identified in all three children, and blames their difficulties on the fact that they are in state's custody and have been put on medication. While he loves the children, he does not make significant efforts to improve his parenting of them.
Dr. Collins concluded that it may be "unrealistic to expect [Pravat] to achieve the skills needed to assume full parenting of his children." At trial, Dr. Collins testified that even with the most intensive services, it would take a minimum of two years before a successful, non-harmful reunification could conceivably occur.
The termination proceeding took place in January 2010 before Superior Court Judge Sharon Gleason. The court heard testimony from a variety of parties, including both foster parents, two of Pravat's three case managers, a number of visitation supervisors, the assistant guardian ad litem, the ICWA specialist for the Anchorage region of OCS, Dr. Rose, Dr. Truitt, Dr. Collins, Pravat's friends, the police officers who responded to the June 2006 call, a Buddhist monk, Pravat's coordinator in his fathering courses, and mental health clinicians. At the conclusion of the trial, the superior court found that the State had satisfied the requirements for the termination of parental rights under ICWA and the Child in Need of Aid (CINA) statutes and rules.
Pravat appeals.

III. STANDARD OF REVIEW
"We review a superior court's findings of fact for clear error."[4] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a *270 definite and firm conviction that a mistake has been made."[5] "We review de novo whether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules."[6] "Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[7]
We also review for clear error the superior court's factual determinations as to whether the State met its evidentiary burden in showing that the children are in need of aid,[8] that the parent has not remedied his conduct or the conditions that placed the children at substantial risk,[9] that returning the children to the parent would likely harm them,[10] and that termination of parental rights is in the children's best interest.[11]

IV. DISCUSSION
Under ICWA and Alaska's CINA statutes and rules, OCS must prove five elements under various evidentiary standards before a court may terminate parental rights in a case involving an Indian child.[12] OCS must prove by clear and convincing evidence (1) that the child has been subject to conduct or conditions described in AS 47.10.011, such that the child is "in need of aid";[13] (2) that the parent has failed, within a reasonable time, to remedy the conduct or conditions in the home that placed the child at substantial risk of harm;[14] and (3) that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts proved unsuccessful.[15] OCS must also prove, by evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, (4) that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.[16] Finally, OCS must prove by a preponderance of the evidence (5) that termination of parental rights is in the best interests of the child.[17]
Pravat argues that the superior court erred in determining that OCS met its burden of proof under elements (2) through (5). He does not contest the superior court's determination that OCS satisfied element (1) by proving through clear and convincing evidence that the children were in need of aid.[18] Because Pravat's central argument is against element (3), the active efforts requirement, we begin there.

A. The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Family.
Before the parental rights to an Indian child may be terminated, ICWA requires the State to prove by clear and convincing *271 evidence that it made "active efforts. . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[19] "We have held that no pat formula exists for distinguishing between active and passive efforts and have adopted a case-by-case approach for the active efforts analysis."[20] But we have drawn upon the following models of active and passive efforts:
Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. In contrast, [a]ctive efforts [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[[21]]
The court should look to OCS's "involvement in its entirety," and may consider a parent's demonstrated unwillingness to participate in treatment as a factor in determining whether OCS met its active efforts burden.[22]
The superior court held that OCS made "active and reasonable efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of [Pravat]'s family, but those efforts proved unsuccessful." The court found that OCS's efforts included: (1) attempting to obtain a hearing aid for Pravat from the Division of Vocational Rehabilitation following his release from jail; (2) arranging for visitation at the Eklutna Center, which could provide parenting assistance and coaching to Pravat, all of which failed; (3) attempting to locate therapeutic services for Pravat, which were rejected by him; (4) contacting the Buddhist temple and arranging for a visit with an interpreter and Pravat; (5) having a Laotian-speaking supervisor oversee visits; (6) requiring Pravat to use his hearing aid while visiting with his children; (7) encouraging Pravat's enrollment in and completion of an emotion management class at Cook Inlet Tribal Council, which was completed by Pravat but not applied by him to his children; (8) encouraging Pravat's enrollment in and completion of a class for parents of children with Fetal Alcohol Spectrum Disorder, which was completed but not applied by Pravat to his children; (9) arranging counseling for Pravat to apply the concepts from those classes to his children, which proved unsuccessful; (10) providing interpreters; (11) providing evaluations by Dr. Rose and Dr. Collins; and (12) attempting to enhance reunification by keeping the boys together in foster care, as Pravat requested.
In addition to the actions taken by OCS, the court looked at Pravat's cooperation as a factor in its active efforts analysis. The court found that while Pravat did attend the classes asked of him, he "appeared to be going through the motions rather than truly engaging." The court found that throughout these programs, Pravat "repeatedly indicated that he did not need help and did not always wear his hearing aid." Accordingly, because he was not fully cooperative, the court noted that "[h]is motivation affected the level of efforts that would otherwise be required."[23]
*272 Pravat argues that OCS undermined his chances at reunification by, among other things, failing to provide cultural continuity to his sons and failing to provide parent modeling.[24] It is true that OCS's efforts were not perfect, as the superior court also recognized. There were delays. OCS reasonably decided to put off Pravat's participation in parenting, anger management, and Fetal Alcohol Spectrum Disorder classes until after he completed a psychological assessment. But the assessment, which had been proposed in June 2007, did not take place until March 2008. In November 2008 Pravat submitted to OCS a joint proposal with the guardian ad litem's office in favor of transferring visits from OCS to Cook Inlet Tribal Council, to be supervised by Pravat's counselor at Cook Inlet Tribal Council. Without a wholly persuasive justification, OCS refused to transfer the visits to Cook Inlet Tribal Council until July 2009.
But the active efforts requirement does not require perfection. Our concern is not with whether the State's efforts were ideal, but with whether they crossed the threshold between passive and active efforts.[25] In the present case, the multiple actions taken by OCS and summarized by the superior court, viewed as a whole, decisively crossed the threshold into active efforts. This is certainly not a case in which a plan was drawn up and the parent was left to his own devices in carrying it out.[26]
It is also worth emphasizing that a parent's lack of cooperation may excuse minor faults in OCS's efforts.[27] Pravat has repeatedly displayed a lack of cooperation. He failed to appear at so many visits at the Eklutna Center that the organization referred those visits back to OCS. He rejected the local therapist proposed by the Buddhist monks. Above all, from his first evaluation in the spring of 2008 to his final evaluation in the fall of 2009, he has repeatedly refused to acknowledge that his actions contributed to the problems faced by his sons, and he has even refused on multiple occasions to acknowledge the boys' disabilities. Given the evident futility of the many steps OCS did take, it is not persuasive to suggest that the additional steps proposed by Pravat in his brief on appeal would have led to a successful reunification.
The superior court's summary of the State's efforts is adequately supported by the record. In light of these efforts, as well as Pravat's lack of cooperation, we affirm the superior court's conclusion that the State met its active efforts requirement.

B. The Superior Court Did Not Err In Finding That Pravat Had Not Remedied His Conduct.
Before a court may terminate parental rights, it must find by clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[28] In making this determination, "the court may consider any fact relating to the best interests of the child."[29] Relevant factors include, but are not limited to: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harm will continue; and (5) the history of conduct or *273 conditions created by the parent.[30] We recently clarified that "whether the parent has remedied the conduct or conditions . . . that place the child at substantial risk . . . [is a] factual determination[] best made by a superior court after hearing witnesses and reviewing evidence, not [a] legal determination[] to which an appellate court should apply its independent judgment."[31] Therefore, we review for clear error the superior court's determination that Pravat failed to remedy his harmful conduct such that giving him physical custody would place the children in substantial risk of physical or mental injury.[32]
The court found that even though Pravat completed the necessary steps on his case plan, "he does not realize today that the children's exposure to him tying up [Stella] in their presence for 15 minutes was harmful to the children." Because Pravat failed to recognize the impact of domestic violence on the children, the court found there to be a substantial risk that the children would be exposed once again to domestic violence if returned to Pravat's home.
The court further found that Pravat continued to maintain that all was well in his home before the children were taken into foster care. As the court stated, Pravat's "unwillingness or inability to realize that he was a less than model parent, [and] that the children were subjected to neglect in his care, indicates that the condition of neglect would not be remedied if the children were returned home." The court found that all of the experts agreed that the children could not be placed back in Pravat's home at the time of trial.
The record adequately supports the superior court's findings. For example, in his own testimony at trial, Pravat still could not explain why it was wrong to bind Stella with belts in front of the boys:
Q: . . . [D]id you do anything wrong on June the 20th, 2006[?]
A: Yes. Because I tied [Stella] up. And yes, I'm wrong.
Q: And why was that wrong?
A: I don't know. The police are saying I'm wrong because I tied her up.
Q: Do you think you're wrong?
A: Yeah, I accept that I'm wrong, because I tied her up.
Q: What was wrong about it?
A: It's wrong because I tied her.
Q: Why is that wrong?
A: I don't know, because I don't really know the laws.
Later, when asked again why it was wrong to tie somebody up, Pravat responded: "I don't know. The police said it's wrong, so I went to court. They said I was wrong and I had to pay money." Pravat repeated in his testimony that he was the victim of Stella's lies and that he lost his children and belongings because of her lies.
In addition, Dr. Rose testified that Pravat failed "to look at his own behavior and the role that it played in problems in relationships and the difficulties that he had with OCS," and that without Pravat "showing progress in his ability to take responsibility, as well as improv[ing] his parenting practices and hav[ing] a much clearer understanding of what . . . the children's problems are," Dr. Rose would be concerned about the children's emotional and physical safety.
We have previously held that similar failures to accept or understand a child's disabilities constitutes a failure to remedy, even if the parent undertakes steps recommended by OCS to try to learn about the problems.[33] Even completing a case plan does not guarantee a finding that the parent has remedied his or her conduct.[34] The superior court did *274 not clearly err in concluding that Pravat continues to minimize his children's disabilities, does not recognize the neglect that existed before the children were put into foster care, and does not accept responsibility for his past actions, and thus that Pravat failed to remedy his harmful conduct.

C. The Superior Court Did Not Err In Finding That Returning The Children To Pravat Would Likely Result In Serious Emotional Or Physical Injury.
To terminate parental rights, the court must find based on "evidence beyond a reasonable doubt that returning the child to the parent is likely to result in serious physical or emotional damage to the child."[35] This finding must be supported by expert testimony.[36] "Proof that a parent's custody is likely to cause a child serious harm requires proof that (1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[37]
The court found beyond a reasonable doubtbased on the expert testimony of Dr. Rose, Dr. Collins, and Dr. Truitt, in combination with other evidencethat returning the children to Pravat was likely to cause them serious emotional and physical damage. All three, and especially Dr. Rose and Dr. Collins, expressed doubts about Pravat's ability to reunite with his children in a safe manner. Pravat argues that the superior court placed too much weight on Dr. Rose's testimony. But we defer to a superior court's credibility determinations, particularly when they are based on oral testimony.[38]
Because the record adequately supports the superior court's findings, we hold the court did not err in concluding that Pravat's custody over the children would likely result in serious damage to them, and that his conduct is unlikely to change.

D. The Superior Court Did Not Err In Finding That Terminating Pravat's Parental Rights Was In The Best Interests Of The Children.
Under AS 47.10.088(c) and CINA Rule 18(c)(3), the superior court must consider the best interests of the child in deciding whether to terminate parental rights. The court can consider any factor of relevance to the child's best interests, including the child's need for permanency and stability.[39] In this analysis, it is the best interests of the child, not the parent, that are paramount.[40]
Dr. Collins testified that Pravat would not be ready to take custody for at least another two years, even under the best of circumstances. At that point, Pravat would still require substantial support and services. This court has previously held that "a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[41] Pravat's children require a permanence and stability that he cannot offer them and that the evidence suggests he will not be able to offer them within any reasonable period of time. The superior court did not err in ruling that it was in the children's best interests to terminate Pravat's parental rights.

*275 V. CONCLUSION
Because the evidence supported the superior court's factual findings regarding the State's efforts to promote reunification, and because those efforts were sufficient as a matter of law under ICWA, we AFFIRM the superior court's determination that the State made active efforts to prevent the breakup of Pravat's family. In addition, the evidence supported the superior court's findings that Pravat failed to remedy the harmful conduct that placed his children at substantial risk, that Pravat's custody of the children would likely result in serious emotional or physical damage to them, and that the termination of Pravat's parental rights is in the best interests of the children. Accordingly, we AFFIRM the decision of the superior court terminating Pravat's parental rights.
CHRISTEN, Justice, not participating.
NOTES
[1] Pseudonyms have been used throughout the opinion to protect the privacy of the family.
[2] 25 U.S.C. § 1903(4).
[3] The Laotian-speaking visitation supervisor at OCS also displayed no knowledge of the 1-2-3 Magic program while testifying at trial.
[4] Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 235 P.3d 203, 209 (Alaska 2010) (citing Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 88 P.3d 527, 529 (Alaska 2004)).
[5] Id. at 209-10 (quoting Brynna B., 88 P.3d at 529) (internal quotation marks omitted).
[6] Id. at 210 (citing Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 102 P.3d 932, 935 (Alaska 2004)).
[7] Id. (quoting Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 216 P.3d 1180, 1186 (Alaska 2009)) (internal quotation marks omitted).
[8] T.B. v. State, 922 P.2d 271, 273 (Alaska 1996).
[9] Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 234 P.3d 1245, 1253 (Alaska 2010).
[10] Id.
[11] Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 222 P.3d 841, 850 (Alaska 2009) (citing Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 77 P.3d 715, 717 (Alaska 2003)).
[12] Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 235 P.3d 203, 209 (Alaska 2010).
[13] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).
[14] AS 47.10.088(a)(2)(B); CINA Rule 18(c)(1)(A)(ii).
[15] 25 U.S.C. § 1912(d) (2002); CINA Rule 18(c)(2)(B).
[16] 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).
[17] CINA Rule 18(c)(3); AS 47.10.088(c).
[18] Although Pravat lists this argument in his formal points of appeal, he does not mention it in his summary of issues presented and he fails to brief it. Therefore, it is waived. Hymes v. DeRamus, 222 P.3d 874, 887 (Alaska 2010) ("[I]ssues not argued in opening appellate briefs are waived.").
[19] 25 U.S.C. § 1912(d).
[20] Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 235 P.3d 203, 213 (Alaska 2010) (citing A.A. v. State, Dep't of Family & Youth Servs., 982 P.2d 256, 261 (Alaska 1999)) (internal quotation marks omitted).
[21] Id. (quoting A.A., 982 P.2d at 261 (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984))).
[22] Id. (citing Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 175 P.3d 1263, 1268 (Alaska 2008)) (internal quotation marks omitted).
[23] See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 204 P.3d 1013, 1021 (Alaska 2009) ("Where services have been provided and a parent has demonstrated a lack of willingness to participate or take any steps to improve, this court has excused minor failures by the state and rejected arguments that the state could possibly have done more.").
[24] Pravat also objects in his reply brief that OCS's active efforts evidence is primarily based on the notes of a deceased social worker whom Pravat had no opportunity to cross-examine. But Pravat did not appeal the superior court's reliance on the social worker's notes in his initial brief. A reply brief "may raise no contentions not previously raised in either the appellant's or the appellee's briefs." Crittell v. Bingo, 83 P.3d 532, 536 n. 19 (Alaska 2004) (quoting Alaska R.App. P. 212(c)(3)).
[25] See Dale H., 235 P.3d at 213 (describing our task as "distinguishing between active and passive efforts") (internal quotation marks omitted).
[26] See supra note 21 and accompanying text.
[27] See supra note 23.
[28] AS 47.10.088(a)(2)(B).
[29] AS 47.10.088(b).
[30] AS 47.10.088(b)(1)-(5).
[31] Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 234 P.3d 1245, 1253 (Alaska 2010) (citation and internal quotation marks omitted).
[32] Id.
[33] See id. at 1260; Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 74 P.3d 896, 903 (Alaska 2003).
[34] See Barbara P., 234 P.3d at 1260 (Alaska 2010) (citing V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 45 P.3d 1198, 1208 (Alaska 2002) ("Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.")).
[35] Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 204 P.3d 1013, 1019-20 (Alaska 2009) (citation omitted).
[36] Id. at 1020 (citing L.G. v. State, Dep't of Health & Soc. Servs., 14 P.3d 946, 950 (Alaska 2000)).
[37] Id. (citing L.G., 14 P.3d at 950).
[38] Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 165 P.3d 605, 617 (Alaska 2007) (citing Martin v. Coastal Vills. Region Fund, 156 P.3d 1121, 1129 (Alaska 2007)).
[39] See Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 102 P.3d 932, 936-37 (Alaska 2004).
[40] Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 182 P.3d 1110, 1116 (Alaska 2008) (citation omitted).
[41] Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 233 P.3d 597, 603 (Alaska 2010).