*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JACE B. (Father), | ) | |
| | ) | Supreme Court No. S-19490 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-19-00355 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY AND COMMUNITY | ) | No. 7811 – May 29, 2026 |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una Gandbhir, Judge.

Appearances: Rachel Cella, Assistant Public Defender, Anchorage, and Terrence Haas, Public Defender, Anchorage, for Appellant. Laura Wolff, Assistant Attorney General, Anchorage, and Stephen J. Cox, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

ORAVEC, Justice.

## I. INTRODUCTION

A father appeals the termination of his parental rights to his child, who is an Indian child as defined by the Indian Child Welfare Act (ICWA).[1] He argues that the Office of Children's Services (OCS) did not make active efforts to reunify him with his son. We agree with the father because the record shows that OCS did not make referrals or provide support for his completion of substance abuse treatment and did not otherwise connect him with services aimed at assisting reunification. Accordingly, we reverse.

## II. FACTS AND PROCEEDINGS

### A. Facts

Effie S. and Jace B.[2] are the parents of Jonah, who was born in February 2022. Effie reported to hospital staff that she had been using methamphetamine throughout the early stages of her pregnancy and on the day of delivery. The staff reported this to OCS, but because Jonah did not test positive for methamphetamine, he remained with Effie. Although Effie initially informed hospital staff that Jace was not involved in their child's life, she later indicated that Jace visited Jonah when he was two weeks old.

In September, hotel staff called the police to report an unattended child found in one of the hotel rooms. The child was in the care of an adult who appeared to be under the influence of substances and had locked herself out of the hotel room. OCS took emergency custody of Jonah. After OCS eventually located Effie, Effie was unable to share information about possible relatives Jonah could be placed with.

---

[1] The child is eligible for enrollment in his mother's tribe. *See* 25 U.S.C. § 1903(4).

[2] Pseudonyms are used to protect the privacy of the parties. Effie relinquished her parental rights to Jonah prior to the termination trial and is not participating in this appeal.

However, she did tell OCS that Jace was the child's father and that he was incarcerated but due to be released from a halfway house.

The next day, OCS located Jace at the halfway house where he was incarcerated and delivered the emergency petition, along with instructions for Jace to call into the hearing the next day. Jace telephonically attended the emergency hearing. The court awarded OCS temporary custody after finding that there was probable cause to believe Jonah was a child in need of aid (CINA) due to his mother's substance abuse and his father's incarceration. Jace later was discharged from the halfway house and was assigned a probation officer.[3] For the next two and a half years, a succession of five different caseworkers were assigned to the family by OCS.

1. **From September 2022 to April 2023, OCS established generic goals and recommendations for Jace but missed opportunities for connecting with him and did not help him make substantive progress with his case plan.**

Shortly after removal, the first caseworker coordinated a meeting to discuss placement options for Jonah, which Jace attended. A second caseworker was assigned in late September, and she arranged for family visitations to take place at Cook Inlet Tribal Council (CITC). Jace took advantage of multiple visitation opportunities at CITC before any case planning took place.

The caseworker scheduled a case planning meeting for the end of October, but Jace did not attend. The caseworker then prepared a generic plan indicating that Jace had not engaged with the department.[4] Jace's goals under this plan were to engage with the department, complete a safety assessment, complete and follow recommendations of a substance abuse assessment, collaborate with OCS to identify

---

[3] Jace was on probation throughout this case for unrelated conduct predating the birth of Jonah.

[4] Despite the case plan's indication that Jace had not engaged with the department, we recognize that Jace had been present at the emergency hearing, the meeting, and multiple visitations at CITC by that point in time.

local resources and parenting education opportunities, develop a family contact plan with OCS, and update the case plan. For each of these goals, OCS indicated it would help by making a referral and providing support as needed; for some of these goals, OCS indicated it should request funding as well. OCS's next steps were to "continue to make efforts to engage" with Jace, and to "work . . . to complete a Safety Assessment and develop an Individualized Case Plan." No referrals were identified or included in the case plan.

In early November, Jace connected with the caseworker and was provided a copy of the initial case plan to review and consider. He also was provided a pamphlet about protective factors for strengthening families, but his case plan was not updated at that time. Jace informed the caseworker that he was living with his mother and that he wanted to work on his case plan in order to reunify with his son. The caseworker talked to Jace about parenting classes, advised him to complete a substance abuse assessment, participate in urinalysis testing (UAs), and consider whether there were any family members Jonah could be placed with. The two agreed that they would meet again in late November to discuss next steps.

Although Jace attended two visitations in November, he missed the scheduled appointment with the caseworker, and a few days after that, he missed a scheduled visitation. The OCS visitation supervisor sent a text message and left two voicemails but did not receive an immediate response. Jace later agreed to reschedule the case planning meeting for early December.

Jace and the caseworker met in person and updated the plan together. This new plan acknowledged that Jace was a "[r]eally new parent, this is his first time," that he had "some, but not a lot of babysitting experience," and that he was "open to receiving parenting education." But the goals of the plan remained essentially unchanged from the initial one. Jace's next steps included maintaining contact with the department, signing releases of information (ROIs) to enable communication between OCS and his service providers, and completing UAs. Jace identified he would need

transportation, food stamps, and familial support. With regard to OCS's duties, the plan identified service providers, including two potential providers for the substance abuse assessment, a provider for random UAs, and a provider for parenting education resources and visitation. Jace and OCS signed the plan. After the meeting, the caseworker left a voicemail message regarding the UA process.

Jace missed scheduled visits with Jonah in December. Around this time, OCS assigned a new caseworker, the third in the case. Although there had been no referral for a substance abuse assessment, the caseworker referred Jace for two UAs that month. It is unclear if Jace was aware of the referral, but he did not report to complete the UAs.

During Jace's visit with Jonah in January 2023, the OCS visitation supervisor spoke with Jace, but no one else from OCS contacted Jace to discuss his progress with the case plan or inquire as to whether he had any support needs. By this time, OCS still had not made referrals for substance abuse assessments, parenting classes, or further UAs. The next day, OCS held another meeting to discuss how to get the parents more engaged in meeting with OCS. OCS was unable to further connect with Jace in January, although the caseworker attempted to reach him by phone or text.

Jace next met with the caseworker in February, expressing that he was discouraged and that he felt like giving up in trying to make progress towards reunification with his son. He admitted he had been drinking for a couple of months but had stopped in January. Jace shared that he had been spending time with Effie, and that he felt "he can't be around her" because he was more prone to drinking when he was with her. The caseworker encouraged Jace to schedule a substance abuse assessment and stated she would resend the referral for the UAs. Instead of referring Jace for a substance abuse assessment, she instructed him to schedule an assessment with CITC by attending one of CITC's weekly "walk-in" windows. Two weeks after this meeting, the caseworker sent the referral for UA testing and called Jace to remind him. Jace completed the two referred UAs, one in late February and another in March.

It is not clear whether OCS maintained any form of communication with Jace from late February to late April, but around that same time, Jace initiated and completed the in-person intake process for CITC's parenting classes. Jace participated in the parenting class and support group at CITC from the end of February through mid-March 2023. He consistently visited with Jonah in March, April, and the first half of May. Other family members occasionally accompanied Jace to the scheduled visits. Aside from the staff responsible for supervising visits, OCS did not utilize the visits as opportunities to connect with Jace. The caseworker next met with Jace on April 20, where they discussed "the standard case planning."

2. **By May 2023, OCS had lost contact with Jace and had not identified potential barriers preventing Jace from engaging with the department.**

Jace was out of contact with OCS beginning in late May 2023. In June, Jonah was adjudicated a child in need of aid due, in part, to his father's substance abuse. That summer, OCS assigned a new caseworker, the fourth for the case. The caseworker unsuccessfully attempted to reach Jace by phone, text, and letters, though it is unclear where these letters were sent or if Jace received them. In its predisposition report, OCS noted Jace had not completed a substance abuse assessment, did not participate in UAs, and had not completed parenting education or an anger management course. The predisposition report did not record Jace's February 2023 enrollment in parenting classes and progress toward completion of the course, nor that Jace had participated in UAs.

The caseworker searched VINELink in an effort to locate Jace. He later located Jace in jail and contacted him to schedule a case planning meeting; he also invited Jace to a meeting scheduled for mid-September regarding Jonah's placement. Jace attended the meeting. Jonah was then placed with Jace's mother. In October, the caseworker attempted to reach Jace by text, but Jace did not respond. He also attempted to reach Jace through Jace's mother to see if a meeting could be held at the home. When

Jace was released from jail in October, he stayed with his mother while she recovered from surgery.

In late October, OCS prepared a report for the permanency hearing. This report restated that Jace would benefit from a substance abuse assessment and any recommended treatment, anger management through an identified provider, random UAs, other substance abuse support meetings, parenting education, domestic violence education, and family contact through CITC. The report also noted that Jace had not been in consistent contact with OCS despite phone calls, text messages, or messages through Jace's mother. In November, the caseworker was notified via VINELink alert that Jace was back in jail. The caseworker visited with Jace while he was in jail to review the existing case plan, but did not case plan further, consider available custodial programs, or arrange for visitation with Jonah.

### 3. From the end of 2023 through 2024, OCS made no further efforts at case planning or attempts at meaningful engagement with Jace.

In January 2024, OCS filed a petition to terminate Jace's parental rights.[5] Jace was still incarcerated when he was served with the termination petition. In February, OCS met with Jace's mother to discuss Jonah's permanency options. In March, OCS sent a letter to Jace asking that he contact the department, and in April, OCS attempted to call Jace. On Jace's release in early March, Jace returned to his mother's house to take care of her and Jonah.

In late May, OCS learned that Jace's mother had died. The caseworker indicated he intended to schedule a meeting to discuss placement options, but no meeting was scheduled. Jonah was removed in mid-June when Jace's mother's partner

---

[5] The petition was filed against Jace, Effie, and the father of Effie's other child born during the case. Because the petition was filed as against all of the parents, the language of the petition does not make it clear which particular grounds for termination under AS 47.10.011 initially were alleged against Jace.

reported that he was unable to continue to provide care and that Jace was having unsupervised visitation.[6] A couple of days later, the caseworker attempted to contact Jace but was not successful.

Between June 2024 and the termination trial, Jace and his father initiated and scheduled visitation with Jonah's foster placement on several occasions. A fifth caseworker was assigned to the case in August 2024. The caseworker learned through OCS notes that Jace was on probation, but he did not reach out to the probation officer to connect with Jace. At the same time, Jace re-enrolled and resumed parenting classes at CITC and signed an ROI for OCS to obtain the information. The caseworker did not follow up on the ROI provided by Jace and was unable to reach Jace at known phone numbers. In September, Jace initiated a case planning meeting with the caseworker, but did not show up or answer the caseworker's follow up calls and texts. Jace was incarcerated again in October, but the caseworker did not learn of this until January 2025 when he checked VINELink. Later that month, Jace contacted the caseworker and shared that he was taking parenting classes through CITC. The caseworker did not case plan, meet with Jace while he was incarcerated, identify providers, or make new referrals.

Jace was set to complete his parenting courses at CITC; at the time of trial in March 2025, he stated that he only had one more class to complete. He was also due to complete a substance abuse assessment the following week, which he had scheduled on his own in January. He completed UAs with his probation officer, and his results were negative except for marijuana. He also obtained full-time employment at a hotel.

---

[6] Jonah was returned to his former foster placement.

**B.    Trial Proceedings**

The termination trial took place over two days in February and March 2025. The court heard from nine witnesses, including four from OCS. OCS offered testimony about the efforts of all five caseworkers.

After evidence closed, the parties submitted written closing arguments. The State's closing argument failed to address whether it had referred Jace to services, provided support such as travel vouchers, updated Jace's case plan, or arranged for visitation. In his closing argument, Jace asserted that active efforts require "more from the Department than providing names and numbers of providers for services." He pointed to testimony where caseworkers could not confirm they had followed through with referrals or testify as to what arrangements had been made for him, and complained that although OCS knew he was incarcerated, no efforts were made to connect with him during those times. The Tribe and the guardian ad litem (GAL) also filed closing arguments. The Tribe supported termination of parental rights. However, the GAL did not support termination, raising concerns that "the department has not proven by clear and convincing evidence that they provided active efforts to provide remedial services to the child and the parents."

The court made its findings on the record in May, noting first that "[it was] not going to go into a great deal of detail regarding the specific facts" because the court "believe[d] that the Department's briefs set out the facts of the case fairly thoroughly."[7] The court addressed OCS's efforts in the case, stating that caseworkers had testified "regarding what happened and . . . the attempts that they made to reach out." The court noted that a case plan had been completed in October 2022, that OCS recognized Jace

---

[7]    We do not credit as fact finding the superior court's reference to OCS's briefs and closing argument as "set[ing] out the facts of the case fairly thoroughly." OCS's argument did not address referrals or resources, and Jace's closing argument highlighted such failures. Jace's factual disputes were not implicitly resolved by reference to OCS's closing argument.

was a first-time parent with "a lot to learn," but that "it looks like he did not participate." The court pointed out that Jace did not show up to one meeting in January 2023, and that there was a UA referral made that month. And the court acknowledged that "at some points [Jace] was incarcerated, and there were less than perfect efforts there for sure to remain in touch with him and to have him engage."

The court found that Jace had not always collaborated with OCS to make progress towards reunification, but that he had started to make some progress and appeared "self-motivated" as Jace was "making that effort without OCS's always informing him of things or setting those up for him." The court further found that Jace's improved efforts to engage with OCS largely came after the petition for termination was filed, "[b]ut for the majority of this case, [OCS's] efforts have been unsuccessful." Although there were other comments made about Jace's efforts to remedy, there were no further findings about OCS's efforts to support Jace.

The court terminated Jace's parental rights on the grounds of abandonment and substance abuse.[8]

## III. STANDARD OF REVIEW

Whether substantial evidence supports a trial court's conclusion that OCS made "active efforts" toward reunification of the family of an Indian child is a mixed question of fact and law.[9] "We review factual findings for clear error, reversing only if, after 'review of the entire record' . . . we are left 'with a definite and firm conviction

---

[8] AS 47.10.011(1) and (10).

[9] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 560 (Alaska 2022) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

that a mistake has been made.' "[10]  However, whether the trial court's factual findings satisfy ICWA is a question of law that we review de novo.[11]

## IV.    DISCUSSION

In ICWA cases, the court may not terminate parental rights unless it makes a finding that OCS made active efforts to provide remedial services designed to prevent the breakup of the Indian family, and that these efforts have been unsuccessful.[12]  This appeal centers on the superior court's conclusion that OCS made active efforts.[13]  Jace argues that OCS's efforts here did not meet the active efforts requirement.[14]  After reviewing the court's findings of fact and conclusions of law, along with the evidence in the record,[15] we agree that OCS did not make active efforts as required by ICWA.

---

[10]    *Id.* (omission in original) (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

[11]    *See Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017) (quoting *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 643 (Alaska 2013)).

[12]    25 U.S.C. § 1912(d); 25 C.F.R. § 23.120(a) (2026); CINA Rule 18(c)(2)(B).

[13]    Jace also appeals whether the superior court appropriately qualified expert witnesses to testify as to the risk of serious harm if Jonah were reunited with Jace, arguing that expert witnesses should be expressly qualified by the superior court to testify on the particular contested basis for termination.  Because we reverse the termination of Jace's rights, we decline to address this issue.

[14]    Jace argues that the superior court erroneously weighed OCS's efforts against the best interests of the child.  The argument rests on one sentence occurring within several transcript pages in the record.  In the context of the superior court's discussion of OCS's efforts and the best interests of the child, it is not clear to us that the superior court conflated the two inquiries.  Nonetheless, because we reverse the termination of parental rights, we need not resolve the issue here.

[15]    Jace also argues that the evidence presented by the State was insufficient to support a finding that OCS met its statutory burden under 25 U.S.C. § 1912(d). Because we reverse the superior court's active efforts determination, we need not reach the sufficiency of the evidence argument.

OCS failed to provide referrals to address Jace's substance use and failed to engage with and provide services to Jace to support reunification of the family.

ICWA requires that "active efforts must be 'tailored to the facts and circumstances of the case.' "[16] We expect "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[17] Although OCS's efforts need not be perfect,[18] and we generally evaluate efforts over the entirety of the case and may consider all services provided to the family,[19] OCS's efforts must pass the threshold from passive to active.[20] The active efforts inquiry should be primarily focused on OCS's actions.[21] Here, the court found that OCS made active efforts because it prepared a case plan, referred Jace for a UA, and attempted to contact him to engage him in services.[22] It was not clearly erroneous for the court to conclude that OCS prepared a case plan, made UA a referral, and attempted to contact Jace because the record supports that these efforts occurred. But

---

[16]    *Anton K. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 467 (Alaska 2024).

[17]    25 C.F.R. §§ 23.2, 23.120(a) (2026).

[18]    *Mona J. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011)).

[19]    *Anton K.*, 554 P.3d at 466 (quoting *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012)); *Ronald H. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 366 (Alaska 2021).

[20]    *Anton K.*, 554 P.3d at 466.

[21]    *Mona J.*, 511 P.3d at 561-62.

[22]    The superior court's findings of active efforts were sparse, focusing mainly on Jace's failings instead of OCS's efforts. It is not the function of the appellate court to "independently review the record and 'derive bases on which the [trial] court could . . . permissibly' " make its findings. *Solomon v. Solomon*, 420 P.3d 1234, 1242 (Alaska 2018); *see also Slade R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18252, 2022 WL 3906701, at *4 (Alaska Aug. 31, 2022) (unpublished).

on the facts of this case, we disagree with the court's ultimate determination and instead conclude that OCS's efforts were not active as required by ICWA.[23]

Turning first to the issue of case planning, the superior court did not clearly err in finding that OCS completed a case plan for Jace. In late 2022, OCS held three case planning meetings in short succession, and Jace attended two of them. OCS had another case planning meeting with Jace in April 2023, and while he was in jail later that year. But active efforts require more than drafting a case plan; rather, OCS should make an effort in "assisting the parent . . . to satisfy the case plan," including guiding the parent through the steps of the plan and proactively connecting them to resources to overcome barriers that the parent is facing, such as housing instability or lack of reliable transportation.[24] OCS's efforts are passive when it draws up a case plan and leaves the parents to their own devices to meet its requirements.[25]

Our review of the record convinces us that OCS's case planning efforts here were passive. Initially, OCS did not identify any other service providers for Jace. Later, after discussing with Jace his needs for providers and for support services, OCS identified CITC and two service providers as potential resources. But at trial, OCS could not confirm whether any caseworkers throughout the life of the case provided any referrals to Jace, and Jace testified that OCS did not, in fact, make any referrals for him.

---

[23] OCS points to the court's finding of active efforts at the adjudication hearing and argues that Jace should have raised his current arguments at that time. We disagree. The court's earlier finding of active efforts was not based on contested facts; the finding was based on OCS's uncontested offer of proof which cites the same facts relied upon at trial. Although it is "good practice" for the court to actively monitor compliance with the active efforts requirement at every hearing, *Mona J.*, 511 P.3d at 564, because we consider OCS's efforts throughout the case, *Anton K.*, 554 P.3d at 466, a party does not necessarily waive challenges to OCS's efforts if not raised before trial.

[24] 25 C.F.R. § 23.2 (2026).

[25] *Tiffany B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 2022 WL 2066045, *5 (Alaska June 8, 2022) (unpublished) (citing *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256 (Alaska 1999)).

In one instance, Jace was instructed to independently call CITC for a substance abuse assessment and then update OCS once he had an assessment scheduled. We have recognized that when OCS recommends treatment for substance abuse, active efforts can include identification of appropriate programs, assistance in completing the necessary paperwork to enroll, and support for transportation to and from meetings where circumstances allow.[26] That simply did not happen here as OCS did not connect Jace with the appropriate resources.

OCS also did not provide Jace with support services although Jace identified a need for those. And although Jace eventually initiated services with CITC — for parenting classes during two different time periods — OCS did not assist Jace with transportation, scheduling, or provide any other support. Jace, on his own initiative, provided releases of information to OCS, but OCS did not use these to case plan or secure services or referrals. That OCS referred Jace for UAs does not salvage OCS's efforts because OCS never referred Jace for a substance abuse assessment, much less treatment.

We have previously recognized that a parent's noncooperation with the agency can impact the court's analysis of active efforts, but a parent's willingness to engage, or lack thereof, does not excuse passive efforts from OCS; rather the active efforts inquiry should be primarily focused on OCS's actions.[27] Although not explicit in the court's findings, the record reflects that caseworkers testified they would attempt to reach out to Jace by text, phone, or through letters. At varying times, OCS and Jace were in contact, Jace was out of contact with OCS but participating in visitation or parenting classes at CITC, and Jace was out of contact and perhaps incarcerated, often

---

[26] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 271-72 (Alaska 2011).

[27] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561-62 (Alaska 2022).

without OCS being aware of the fact until after some time had lapsed. Although we consider OCS's efforts to reach Jace when he was not in contact, we also have to consider OCS's overall efforts to establish rapport with Jace and support him while he was engaged in visitation or incarcerated.[28] Review of the record here reflects several missed opportunities over the life of the case to contact Jace and engage him in services.

For about the first nine months of the case, Jace and OCS were in contact. After Jonah was removed in the fall of 2022, Jace attended the emergency hearing, OCS arranged for visitation at CITC, and Jace and the caseworker exchanged calls and met to case plan. Although Jace ceased contact with OCS in March of 2023, visitation continued, but OCS never attempted to contact Jace at these visitations even though he was not responding to texts, calls, or email.

In the autumn of 2023, Jonah was placed with Jace's mother. Jace's mother informed OCS that Jace would visit Jonah at her home and OCS left messages with her, but OCS apparently did not attempt to reach Jace there despite the monthly visits by OCS to check on Jonah. Jace was then incarcerated again. Although it initially did not know Jace was incarcerated,[29] when OCS finally became aware, the caseworker only visited once, and did not identify any resources for Jace who remained in jail for about six months.

Jace was released from custody and he moved in with his mother and Jonah. OCS apparently was unaware that Jace had done so or that his mother was sick. Jonah was removed after Jace's mother died, and a new caseworker was assigned, but

---

[28]  ICWA has no exception for incarceration and requires active efforts even when the parent is incarcerated. *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 849 (Alaska 2009) (citing *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995)).

[29]  The caseworker did not know he could set up an alert in VINELink. Although not necessarily required in all cases, a VINELink alert may assist OCS to locate parents when maintaining contact is difficult.

the caseworker made minimal efforts to build rapport with Jace over the next year. The caseworker testified that he attempted to contact Jace once a month, often to no avail. But he further testified that when Jace made the effort to reach out to him, the caseworker did not seek additional information or offer services.

A parent's noncooperation can excuse minor failures by OCS, but a lack of cooperation does not excuse major failures by OCS or minor failures that are unrelated to the parent's behavior.[30] We recognize that engaging with recalcitrant parents is often a challenge, perhaps more so when there is a changeover in caseworkers. But the burden is on OCS to attempt to provide services notwithstanding the participation of the parents.[31] And while we recognize that changes in personnel can cause lapses in the services provided by OCS, this does not excuse OCS from actively working to reunify the family.

While OCS's efforts were more robust in the early months, and Jace was incarcerated or out of contact for a time after that, we cannot ignore OCS's lack of effort leading up to the termination trial. In *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*,[32] over the final two years of a four-year case, the caseworker failed to provide an updated case plan, did not attempt to locate the incarcerated father by using available databases, sent only one letter without visiting him in jail, made no treatment referrals while he was in jail, provided no referrals for drug testing or parenting classes upon release, and did not schedule in-person visits with the children.[33]

---

[30]     *Mona J.*, 511 P.3d at 562-63.

[31]     *Ronan F. v. Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 539 P.3d 507, 516 (Alaska 2023) (recognizing that "an active efforts finding 'turn[s] on OCS's efforts' rather than a parent's actions, and 'OCS must always show that it made active efforts in the first place' ").

[32]     483 P.3d 896, 903 (Alaska 2021).

[33]     *Id.*

We concluded that OCS failed to provide active efforts and reversed the termination of the father's parental rights.[34]

As in *Clark J.*, we are troubled by OCS's lack of effort in this last year before trial. When Jace was incarcerated and OCS learned of this, it did not attempt to visit Jace in jail. Jace undertook a substance abuse assessment on his own initiative and executed ROIs for OCS, but the caseworker did not follow up on Jace's treatment or use these ROIs to case plan. When Jace told the caseworker he had scheduled an assessment but the first appointment was not available for a few months, OCS did not offer to assist Jace in obtaining an earlier walk-in appointment or further inquire if Jace required any other support services such as transportation. And, while testifying that caseworkers would text, call, or mail letters to Jace when they could not get a hold of him, there were times when Jace reached out but OCS neither recorded the attempt nor called him back.

Viewing the record as a whole, we conclude that OCS's efforts do not amount to active efforts.[35] OCS's case planning efforts lacked accompanying referrals and support services that may have aided in Jace's engagement and progress towards reunification with his son. When Jace was difficult to contact by traditional means, OCS did not respond by changing tactics; for example, OCS might have found greater success by attempting to meet him after visitations with Jonah, stopping by his mother's house, or visiting him in jail. Jace was a first-time parent who had expressed on several occasions that he was struggling with his alcohol use, but recognized that he needed education and support. He also took accountability for the times he had not been making progress on the case plan, and more importantly, expressed and demonstrated

---

[34]    *Id.*

[35]    25 U.S.C. § 1912(d); 25 C.F.R. §§ 23.120, 23.2 (2026).

willingness to make progress.  OCS's efforts to support Jace never crossed the threshold from passive to active efforts as required under ICWA.

## V.     CONCLUSION

We REVERSE the termination of Jace's parental rights and REMAND the case for proceedings consistent with this opinion.