NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KAMI C., | ) |
| | ) Supreme Court No. S-18416 |
| Appellant, | ) |
| | ) Superior Court Nos. 3KO-18-00021/22/ |
| v. | ) 23/24 CN (Consolidated) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF FAMILY AND COMMUNITY | ) |
| SERVICES, OFFICE OF CHILDREN'S | ) MEMORANDUM OPINION |
| SERVICES, | ) AND JUDGMENT* |
| | ) |
| Appellee. | ) No. 1979 – August 2, 2023 |
| | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Stephen B. Wallace, Judge.

Appearances: Jason A. Weiner, Jason Weiner & Associates, P.C., Fairbanks, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A mother appeals the termination of her parental rights. She argues that the superior court erred by determining that the Office of Children's Services (OCS)

---

\* Entered under Alaska Appellate Rule 214.

made reasonable efforts to reunite her with her children, and clearly erred by finding that she failed to remedy the conduct or conditions that placed her children at substantial risk of harm, and that termination of her parental rights was in her children's best interests. We affirm the termination order.

## II. FACTS AND PROCEEDINGS

### A. Facts

Kami is the mother of five children, four of whom are involved in this case.[1] She has struggled with drug addiction since around 2013. OCS received reports about Kami's drug use in 2014 when she was pregnant with her third child; that child tested positive for methamphetamine and cocaine at birth. OCS took custody of the children after the birth of Kami's fourth child in 2015. OCS closed the case and released custody of the children to Kami after she successfully completed inpatient substance abuse treatment around the spring of 2017. Within two months of returning home Kami had relapsed and was using drugs again.

In early 2018 OCS received reports that Kami had relapsed. In April OCS arranged an in-home safety plan for Kami's parents to supervise her contact with the children at all times. Kami was initially cooperative with OCS and interested in more drug treatment. In July, after receiving reports that the children were left unsupervised with Kami and known drug dealers, OCS included Kami's sister as an additional supervisor of Kami's contact with the children. After receiving a report that Kami had attempted to buy drugs while accompanied by one of the children, OCS made an unannounced visit to Kami's parents' home in mid-September accompanied by several law enforcement officers. Her parents were away commercial fishing. Kami and a man she identified as her drug dealer were the only adults in the house. One of the police officers with OCS tested the children's possessions for the presence of drugs; their possessions tested positive for methamphetamine, heroin, and cocaine.

---

[1] We use pseudonyms to protect the parties' privacy.

OCS removed the children and filed an emergency petition for adjudication and temporary custody. At the emergency hearing the superior court granted OCS temporary custody. The children were placed back with their maternal grandparents. OCS prohibited Kami from having unsupervised contact with the children, so she moved out of her parents' home and started living out of her car.

**B.  Proceedings**

The court held a status hearing in October. The court observed that under AS 47.10.011(10), Kami's drug use within a year after successfully completing treatment was prima facie evidence that her ability to parent was impaired and that she posed a substantial risk of harm to the children.[2] The court advised Kami that the statute "may be something that you want to talk about with [your lawyer]."

The court held several hearings, including an adjudication hearing, over the next year and found that the children were in need of aid due to Kami's relapse. Kami repeatedly asked for more visits with the children.

OCS filed a petition to terminate Kami's parental rights in January 2020. After she failed to attend the August 2020 termination trial, the court terminated her parental rights on the basis of OCS's offer of proof.

The children remained with their maternal grandparents. But after receiving reports that the grandparents were not supervising Kami's visits with the children, OCS moved the children to their paternal grandmother's home in a community primarily accessible by plane.

In March 2021, Kami moved for relief from termination, stating that OCS

---

[2]    AS 47.10.011(10) (authorizing court to find child in need of aid if parenting ability "has been substantially impaired by the addictive or habitual use of an intoxicant" and providing "if a court has previously found that a child is a child in need of aid under this paragraph, the resumption of use of an intoxicant by a parent . . . within one year after rehabilitation is prima facie evidence that the ability to parent is substantially impaired").

did not give her the correct date for the termination trial. The court granted Kami's motion and restored her parental rights in April.

A second termination trial was held over six days between September 2021 and February 2022. OCS called each of the caseworkers that had worked with the family, a state trooper, and the children's paternal grandmother as witnesses. Kami called her parents as witnesses and testified herself.

The OCS caseworkers testified about their interactions with Kami; some described OCS's efforts in the previous case. The initial caseworker testified that Kami had at first been "very cooperative" with OCS, but started to go "off the radar" after a few months and became a "chronic no-show" for her appointments. As a result, the caseworker drafted a case plan without Kami's participation. The caseworker testified that she made "multiple referrals" to services including drug treatment programs and tried to meet with Kami "where she was comfortable."

The second caseworker testified that Kami initially appeared to be "taking the case planning seriously." But she testified that Kami acknowledged she had unsupervised contact with the children and admitted that she had not been attending counseling consistently. The caseworker testified that OCS continued to have concerns about Kami's unsupervised contact with the children, and would not consider a trial home visit until Kami demonstrated "a pattern of sobriety" and engagement with OCS.

Another caseworker testified she was "not successful in being able to reach [Kami] at any time" and that she was "not aware of [Kami] making any efforts towards changing her behaviors." Other caseworkers testified about Kami's failure to engage in services and described contact with Kami ranging from "pleasant to escalated." One caseworker testified that OCS consistently texted Kami but that Kami's responses varied, describing one incident when Kami called OCS 13 times over a few minutes. The caseworker also testified that Kami slashed OCS employees' tires and once "messed with" her vehicle. An OCS supervisor testified that she traveled to Kami's community to meet with Kami and provide a referral for drug testing, but Kami

was significantly late to their appointment and was unwilling to reschedule or participate in a drug test.

OCS called the children's paternal grandmother, who testified that the children communicated with Kami and Kami's parents through video and messaging while they were in her care. OCS's final witness was a state trooper who had known Kami for many years. The trooper testified about a conversation he had with Kami, who said she was going to kidnap her children after OCS moved them to their paternal grandmother's home.

Kami and her parents presented a different account of events. Kami testified that OCS lied to her, failed to communicate with her, and did not facilitate visitation as it should have. Kami's parents offered a favorable assessment of Kami's parenting abilities, stated that OCS did not communicate with them consistently, and asserted that OCS interfered with visitation after the children were removed from their home.

The superior court terminated Kami's parental rights in May 2022. It found that the children were children in need of aid based on AS 47.10.011(1) (abandonment),[3] (6) (risk of physical harm),[4] (9) (neglect)[5] and

---

[3]    AS 47.10.011(1) (providing that court may make CINA finding if "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid").

[4]    AS 47.10.011(6) (providing that court may make CINA finding if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent . . . or by the failure of the parent . . . to supervise the child adequately").

[5]    AS 47.10.011(9) (providing that court may make CINA finding if "conduct by or conditions created by the parent, guardian, or custodian have subjected the child . . . to neglect").

(10) (substance abuse).[6]  The court also found that Kami had failed to remedy the conduct or conditions that caused the children to be in need of aid, and that OCS made reasonable efforts to reunify her with the children.  Kami appeals.

## III.  STANDARDS OF REVIEW

"Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[7]  To determine whether OCS made reasonable efforts we consider the entirety of OCS's involvement.[8]  "Whether parents failed to remedy their conduct and whether termination was in the children's best interests are both factual findings" and "we review the superior court's factual findings for clear error."[9] "Findings [of fact] are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[10]

"We review de novo whether a superior court's findings satisfy the requirements of the CINA . . . statutes."[11]

---

[6]  AS 47.10.011(10) (providing that court may make CINA finding if parent's ability to parent "has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child").

[7]  *Violet C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1032, 1037 (Alaska 2019) (quoting *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017)).

[8]  *Doug Y. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 243 P.3d 217, 226 (Alaska 2010).

[9]  *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019).

[10]  *Id.* (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[11]  *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011).

## IV. DISCUSSION

### A. The Court Did Not Err By Finding OCS Made Reasonable Efforts To Reunite Kami And Her Children.

Kami argues that OCS failed to make reasonable efforts because it did not involve her in creating a case plan, was disorganized and unresponsive to her, and made only minimal effort to coordinate visits with the children. Kami also argues that OCS actively interfered with visits.

Kami asserts that OCS did "little to no case planning" after her initial meetings with caseworkers. She argues that having so many different assigned caseworkers shows that OCS was too disorganized to have made reasonable efforts. And she argues that the supervisor's inability to remember whether she had a conversation with Kami about her concerns illustrates how transferring the case could have led to a "loss of information." Kami also argues that OCS was not responsive and did not answer her or her parents' calls. Kami claims that OCS did not provide her with reasonable visitation and accuses OCS of actually interfering with her visitation by removing the children from her parents' home. She testified that having only supervised visits was unfair and "[d]rastically" restricted her opportunities to see the children. Kami's parents each testified that OCS never told them whether they could have contact with the children after they were removed from their home.

OCS and Kami offered different versions of her participation in creating a case plan. The initial caseworker testified that OCS had to draft a case plan without Kami because she missed so many scheduled case planning meetings. The next caseworker testified that they worked together on a case plan soon after the caseworker was assigned. The second caseworker also referred Kami to substance abuse treatment, drug testing, and mental health services in the year or so following the children's removal. She described her efforts to work with Kami, including accommodating her preference to meet outside of the OCS building.

OCS also presented evidence, including correspondence between the second caseworker, Kami's attorney and Kami, documenting that both OCS and Kami's attorney tried to contact her regularly but had difficulty reaching her. In response to Kami's claim about disorganization, OCS argues that it consistently worked to contact Kami and engage her with services to address the issues that prevented her from reunifying with the children. And OCS asserts that a single caseworker's failure to remember a single conversation does not undermine its efforts over the entire time it was involved with Kami's family.

Kami's argument that OCS was not responsive is largely based on her complaints that OCS did not answer her calls. But OCS points out that Kami was often completely unreachable and, when she was communicative, called over and over again — in one instance, she called OCS 13 times in a matter of minutes.

In response to Kami's argument that OCS did not provide reasonable visitation and later interfered with the visitation she had, OCS acknowledges that it moved the children because the grandparents' failure to supervise Kami's contact with the children placed them at risk of harm. And OCS also points to the paternal grandmother's testimony that Kami and her parents continued to have contact with the children after they moved.

Kami's own testimony undermines her argument that OCS did not work with her. She testified at trial that she was not interested in working with OCS to develop a case plan. In response to the court's telling her she had a responsibility to follow through with her case plan, she retorted, "I don't want a case plan. My case plan is my life."

The evidence lends some support to Kami's claim that OCS was "disorganized." The second caseworker left the case in June 2020 and another caseworker was not assigned until after the first termination trial in September 2020. A supervisor testified that she tried to contact Kami during those months, but there is no

evidence that she reached Kami. And Kami's mother testified that OCS did not promptly respond to the family's questions and requests.

We have repeatedly held that "a brief lapse in OCS's provision of services does not foreclose a finding that OCS made reasonable efforts toward reunification."[12] OCS's failure to work with Kami's family for two months out of the several years it was involved with the family — including the previously closed case — does not negate the reasonable efforts that OCS did make.[13]

Kami accurately observes that requiring her visits to be supervised restricted her time with the children, and that moving them to their paternal grandmother's home practically eliminated her ability to see them. But the record shows that Kami declined the visits OCS offered her before the children moved because she did not want to submit to drug testing and that she and her parents did not comply with the supervision requirement.

OCS's decision to remove the children from Kami's parents' home was a direct result of Kami's parents allowing Kami to have unsupervised contact with the children. OCS moved the children due to reports of Kami's ongoing drug use and her family's unwillingness to cooperate with OCS's safety requirements. OCS is required to address all safety concerns that arise while it has custody of children to enable their safe return.[14] The superior court concluded that some of the reports that gave rise to OCS's concerns were unsubstantiated, but it also credited some of them. The court

---

[12] *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646 (Alaska 2013) (holding that three-week delay by OCS was insufficient to support finding that OCS did not make reasonable efforts).

[13] *See Roland L. v. State, Off. of Child.'s Servs.*, 206 P.3d 453, 456 (Alaska 2009) (holding under higher "active efforts" standard that OCS's failure to make efforts during 3 of 26 months it was involved was not determinative).

[14] AS 47.10.086(a); *see also Jeff A.C., Jr. v. State*, 117 P.3d 697, 703 (Alaska 2005) (holding that termination of parental rights can be based on conduct that was not basis for adjudication).

acknowledged that removing the children from Kami's parents and sending them to their grandmother in a different community was "hugely disruptive" to the children.

The superior court's conclusion that OCS made reasonable efforts is supported by the record. "[W]e defer to a superior court's credibility determinations, particularly when they are based on oral testimony."[15] It weighed the evidence presented and considered the competing descriptions of events, largely crediting the testimony of OCS witnesses over that offered by Kami and her parents. The court did not err when it found that OCS made reasonable efforts.

B.    **The Court Did Not Clearly Err By Finding Kami Failed To Remedy Her Conduct.**

Kami argues that the superior court erred when it found that she had failed to remedy her conduct. She claims that she was sober for long periods as demonstrated by many of the drug tests she took. Kami also claims — without support — that the clean test results "disappeared." OCS responds that there is no evidence that Kami made any effort to comply with her case plan and that she did not cooperate with drug testing.

The evidence before the court is replete with evidence of Kami's continued substance abuse, association with drug users, and obstructing OCS's attempts to ensure she could be a safe parent. She also "bragged" to a caseworker that she continued to abuse substances after her children were removed, even though at an early hearing the court warned her about the consequence of using drugs again. The court did not clearly err by finding that Kami failed to remedy her conduct.

C.    **The Court Did Not Clearly Err By Finding That Termination Was In The Children's Best Interests.**

Kami argues that OCS failed to establish by a preponderance of the evidence that termination of her parental rights was in the children's best interests

---

[15]    *Pravat P.*, 249 P.3d at 274.

because the court did not specify its basis for the finding. She also claims that the court did not properly consider other factors favoring reunification, like her strong relationship and "extensive involvement" with her children.

Having found that the children were in need of aid because Kami continued to abuse substances and, as a result, had neglected them, the court also found that termination was in the children's best interests. The court is authorized to consider "*any fact* relating to the best interests of the child."[16] The overwhelming weight of evidence demonstrated that Kami has been evasive and combative in response to OCS's efforts to reunite her with the children.[17] Even if Kami had a strong relationship with her children and was extensively involved in their lives, the court was entitled to give more weight to her "consistent obstreperous behavior" and the unreasonable demands she made of OCS. We see no clear error in the court's finding that termination was in the children's best interests.

## V. CONCLUSION

We AFFIRM the superior court's termination order.

---

[16] AS 47.10.088(b) (emphasis added) (listing factors relevant to best interests determination in termination of parental rights context). In addition to the statutory factors, "[t]he superior court may also consider any other facts relating to the best interests of the child." *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014).

[17] *See Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (holding OCS's failed attempts to engage parent met higher "active efforts" standard despite "parent's evasive or combative conduct").