*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RUBY C., | ) | |
| | ) | Supreme Court Nos. S-19535/19536 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court Nos. |
| | ) | 1JU-22-00038/54 CN (Consolidated) |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | O P I N I O N |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES | ) | No. 7813 – June 12, 2026 |
| | ) | |
| Appellee. | ) | |
| | ) | |
| | ) | |
| JASPAR O., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeals from the Superior Court of the State of Alaska, First Judicial District, Juneau, Larry R. Woolford, Judge.

Appearances: Chris Peloso, Juneau, for Appellant Ruby C. Olena Kalytiak Davis, Anchorage, for Appellant Jaspar O.

Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Stephen J. Cox, Attorney General, Juneau, for Appellee.

Before: Borghesan, Henderson, Pate, and Oravec, Justices. [Carney, Chief Justice, not participating.]

HENDERSON, Justice

## I.    INTRODUCTION

A mother and father challenge the termination of their parental rights to two Indian children. The parents argue that the Office of Children's Services (OCS) failed to make active efforts to reunify their family and that the termination order must be reversed on that basis. The mother independently argues that the superior court erred in finding that return of the children to her custody would likely result in substantial harm to the children and that termination was in their best interests.

Because the record in this case supports the superior court's findings of thorough and diligent efforts by OCS to engage with the parents and to provide them with resources that would help to maintain the family, we see no error in the court's determination that OCS made active efforts to reunify the family. Further, we observe no error in the court's findings regarding risk to the children or the children's best interests. We therefore affirm the termination order in full.

## II.    FACTS AND PROCEEDINGS

### A.    The Family And OCS Involvement

#### 1.    Background information

Ruby and Jaspar have two children together — Denver and Celia.[1] Ruby is a member of the Central Council of the Tlingit & Haida Indian Tribes of Alaska

---

[1]    Pseudonyms are used to protect the privacy of the parties.

(Tlingit & Haida), making her children eligible for enrollment.[2] Both Denver and Celia are therefore Indian children within the meaning of the Indian Child Welfare Act of 1978 (ICWA).[3]

Ruby has struggled with substance abuse for more than 20 years. Jaspar also has a history of substance abuse, as well as a history of OCS intervention regarding his children from a prior relationship. OCS worked with Jaspar to resolve safety risks in his household in 2017, and his caseworker later reported that he had done a "wonderful job" responding to OCS's concerns. Although Ruby claimed that her life was stable and she was receiving treatment for opioid addiction when Denver was born in 2019, medical records indicate that Denver was exposed to heroin in utero. And in November 2019, OCS removed Jaspar's older children after he overdosed on heroin. OCS worked on a case plan with Jaspar and referred him to urinalysis testing to demonstrate his sobriety. Among other things, the case plan required Jaspar to provide for his children's needs through food, shelter, clothing, and behavioral assessments, and to undergo his own behavioral health assessment and address any resulting concerns. Jaspar successfully engaged with his case plan and regained custody of his older children in April 2020.

### 2. Denver was taken into OCS custody after the family was evicted in June 2022.

In early 2022 Ruby and Jaspar lived in an apartment in the Juneau area with their son Denver and three of Jaspar's older children. Based upon reports of neglect, abuse, and drug use, in May 2022 OCS sought to obtain hair follicle samples and interviews with the three older children. Jaspar was served with a court order granting these requests but refused to comply.

---

[2]    *See* Const. of the Central Council of Tlingit & Haida Indian Tribes of Alaska art. iii, § 1; Central Council of Tlingit & Haida Indian Tribes of Alaska Code § 15.01.004(A)(1).

[3]    *See* 25 U.S.C. § 1903(4).

In June 2022 OCS again received a report of neglect, this time based on the state of the family's apartment following their eviction. An OCS worker took photos of the apartment and confirmed details of the report: piles of garbage and rotting food covering most surfaces, beds smelling strongly of urine, and feces smeared on the walls of the bathroom and ground into parts of the carpet. Later that day, the OCS worker received a call from the family's neighbor asserting that the parents had left the children in her care with no plans for their return. The worker went to the neighbor's apartment and interviewed one of Jaspar's older children (12 years old at the time). Based upon that child's disclosures, OCS removed Denver and placed him with a foster parent; the older children were also placed in foster care while OCS worked to reunite them with their mother out of state. A hair follicle test for Denver later came back positive for opioids. The parents — Ruby, Jaspar, and the mother of the older children — then stipulated to probable cause that Denver and the older children were in need of aid.[4]

OCS arranged for urinalysis testing of the parents and supervised visitation with the children. Ruby failed to appear for her urinalyses between July and October 2022, and no further urinalyses were scheduled. Both parents attended some visitation and court hearings, but Jaspar was removed from the visitation schedule after he began failing to show up.

At one hearing, Jaspar provided two email addresses and gave consent for email service of case documents. Ruby also gave the court an email address that she had access to.

---

[4] Around this time, Tlingit & Haida filed a notice of intervention in Denver's case. *See* 25 U.S.C. § 1911(c). OCS eventually reunited two of Jaspar's older children with their mother out of state and began facilitating mediation between the mother and the third child in order to reunite them as well.

### 3. Celia was taken into custody in December 2022 after she tested positive for opioids at birth in November.

Celia was born in November 2022. She tested positive at birth for opioids, amphetamines, and methamphetamine. She experienced withdrawal symptoms and was quickly medevacked to Anchorage. OCS anticipated Ruby's arrival at the hospital and began to form a safety plan for Celia's care. Hospital staff reported that within a few days of Ruby's arrival she appeared impaired after leaving the bathroom, which then smelled of methamphetamine. They reported that Ruby was falling asleep while holding Celia and dripping formula on her head. Hospital staff subsequently searched Ruby and found glass pipes, lighters, and small bags of an unidentified substance. OCS then filed an emergency petition to adjudicate Celia as a child in need of aid. The parents stipulated to probable cause that Celia was in need of aid, and OCS placed Celia in the care of a relative.[5] Although both parents expressed an intent to stipulate to a full finding that the children were in need of aid, Ruby did not attend the hearing to make that stipulation, and the court accepted an offer of proof (in lieu of an adjudication trial) to establish the finding that both Denver and Celia were in need of aid due to the parents' substance abuse.

At this early stage of the case, OCS made efforts oriented towards the children. It focused on Denver's health-related and dental needs and worked to eventually secure a family placement with Denver's great uncle. After Celia was released from the hospital, OCS placed her with another family member.

OCS also focused on connecting the parents with treatment for their substance abuse. Jaspar testified that the caseworker assigned after Celia's birth was "very involved." In January 2023 that caseworker visited Jaspar and Ruby at their temporary residence to make appointments with them and provide them Narcan. In February, after a court hearing for which Jaspar and Ruby were present, the caseworker

---

[5] Tlingit & Haida filed a notice of intervention in Celia's case as well.

met with the parents, their attorneys, and the Tribe's ICWA worker to create case plans. For Jaspar, the OCS caseworker provided referrals to a substance abuse assessment, urinalysis testing, parenting classes, and family visitation with OCS. The caseworker also provided applications for housing and required Jaspar to maintain weekly contact with his attorney, OCS, and the Tribe's ICWA worker. Ruby's written case plan was less detailed, but in that meeting the caseworker encouraged her to obtain a substance abuse assessment through one of two listed providers; explore further treatment options to "take steps toward sobriety"; attend family visitation; and stay in contact with her attorney, the OCS caseworker, and the Tribe's ICWA worker. Jaspar and Ruby signed these case plans, and their caseworker gave them bus passes to help them engage with OCS and with service providers.

This initial caseworker for the family later testified about his many attempts to locate the parents outside of these meetings. He spoke of going into the community in Juneau "many times" alongside the Tribe's ICWA worker to look for them. Jaspar later described his impression that it "sound[ed] like a testament to how hard they work and how much they care about bringing [the] family back together."

Meanwhile, Ruby moved to Anchorage in March 2023. She became homeless there and was without a phone. OCS records indicate that in May 2023 she was in touch with OCS over email and receiving substance abuse treatment in Anchorage, but when OCS called the treatment provider in June, provider staff reported that she was not a patient at that time. Ruby attended the July 2023 adjudication hearing for Jaspar's older children telephonically, and OCS did not attempt to touch base with her there. OCS lost contact with Ruby at this point. During this time period, the Tribe was facilitating family visitation for Jaspar in collaboration with OCS. The Tribe suspended visitation, however, after Jaspar failed to show up for several visits.

Later in July, the OCS caseworker met with Jaspar to case plan. The case plan included referrals to multiple local services and required him to attend substance abuse treatment. In August, Jaspar had two visits with Denver before beginning

inpatient substance abuse treatment. He was administratively discharged from treatment shortly after starting due to possession of a nicotine vaporizer. Jaspar then moved to Anchorage in response to a message from Ruby.

### 4. After Ruby and then Jaspar dropped out of contact, OCS focused its efforts on locating them.

In August 2023 the family was assigned a new caseworker. This caseworker made efforts focused on the children, such as ordering a DNA test to confirm that Denver and Celia were full siblings, registering them in early education programs, and helping to enroll them in the Tribe. He also reached out to Jaspar via email, and Jaspar responded to say that he and Ruby would return soon and case plan, but they did not. Jaspar later explained that this was because he was "extremely embarrassed and brokenhearted" about his early discharge from treatment and he felt like his children were "already gone." At this point, Celia was placed with Ruby's aunt and Denver was placed with Ruby's uncle, both of whom lived in Juneau.

By January 2024 the parents had dropped out of contact with OCS altogether, and OCS increased its efforts to locate them. The family's caseworker sent emails to Jaspar in January and February with no response. The caseworker and ICWA worker posted flyers with OCS's and the Tribe's contact information at Bean's Cafe and Brother Francis Shelter in Anchorage.[6] An OCS permanency worker joined in the caseworker's efforts in March 2024. Both workers broadened their search for the parents using email, text, phone calls, a State of Alaska Facebook page, and other online research tools. The permanency worker also spoke with the Tribe about looking for the parents in Anchorage. At the same time, the caseworker met with his supervisor to

---

[6] This effort resulted from collaborations with the Tribe to "brainstorm ideas" for locating the parents.

"come up with ideas for locating the parents" while continuing attempts through email, text, and phone calls.[7]

OCS continued its efforts to locate Ruby and Jaspar and care for the children throughout 2024. The family's caseworker sent messages to the parents' known points of contact and visited with Denver and Celia on an approximately monthly basis, and the permanency worker sent messages on Facebook and investigated new potential points of contact. In July 2024 OCS filed a petition to terminate the parents' parental rights to Denver and Celia and continued its search for the parents. The family's caseworker used VINELink to check whether the parents were incarcerated, and he asked OCS's legal department to compile known addresses and phone numbers, in part from Permanent Fund Dividend records. He used these addresses to send numerous letters for each parent every month between July and November 2024; the letters contained detailed case plans and pre-set appointments to clarify ways in which the parents could engage with OCS. He searched other databases for new addresses without success. During this year, OCS also met with the Tribe to figure out permanency goals for the children and enrolled Denver in school.

OCS did not know the location of either parent until Ruby gave birth to another child, D.D., in December 2024.[8] Ruby was believed to be under the influence at the time, and D.D. tested positive for drug exposure. Ruby and D.D. were assigned a caseworker based in Anchorage. With a termination trial for Denver and Celia approaching, the OCS permanency worker sent messages to both Ruby and Jaspar about upcoming court dates. The Juneau caseworker's attempts to contact Ruby through her

---

[7]     The caseworker would sometimes get a vague idea of Jaspar's location through the older children's cases, and at one point he asked one of them to let Jaspar know that he was trying to get in touch and that Jaspar could call him about the case.

[8]     Initials are used here to protect the child's privacy. Ruby's parental rights regarding D.D. are not at issue in this appeal.

new Anchorage caseworker were unsuccessful, but in January 2025 the caseworker emailed Ruby using new contact information obtained by the Tribe, and Ruby responded, establishing contact for the first time in a year and a half. She said she wanted to meet, but when the caseworker asked for her availability, she did not respond.

## B. The Termination Trial And The Superior Court's Decision

The superior court held a termination trial over three days between January and May 2025, and OCS described the above course of events through the testimony of four OCS workers. On the first day, Jaspar was present, marking his first interaction with OCS since his disappearance in September 2023. He testified about his experience with OCS, explaining that after his engagement that led to inpatient treatment, his failure there made him think that "there was no hope, because [his] kids were already gone and it was already settled." But he also confirmed access to the email addresses given to the court at the start of this case and used by OCS throughout.[9]

Ruby was not present at the first day of trial. Ruby's mother later informed OCS that Ruby was in the process of getting a substance abuse assessment. Not long after this, OCS spoke with Ruby directly and learned that she was attending treatment in Washington. The court held a second day of trial at the end of March, and Ruby appeared telephonically.

At the last day of trial in May, the caseworker testified that he had not attempted contact with Ruby over the prior month because she was in treatment, but that he could see engagement with her other caseworker in the record. Ruby testified that she had been in treatment for 60 days and was doing well; she asked the court to let her children stay with her family in Washington until she was able to get on her feet, maintain sobriety, and find work and housing.

---

[9] Jaspar claimed that his inbox was too full to monitor, but he admitted that he could find relevant emails by searching his inbox. Both OCS workers continued to attempt contact with Ruby and Jaspar after the first day of trial.

An expert witness was qualified to provide an opinion about the "causal relationship between parental conduct and serious damage to the child and the prevailing social and cultural standards of the child's tribe." She ultimately concluded that Ruby's substance abuse, neglect, and abandonment of the children would place them at substantial risk of harm and that continued custody with either parent was likely to result in serious emotional or physical damage to the children. She cited the children testing positive for opioids and the disarray of the home that was found after their eviction. She referred to this as "consistent with a lifestyle that perhaps drugs are a priority over the care of the children." She said that the parents' actions were not consistent with tribal values because they did not evince a respect for their community, and she concluded that both parents needed years of sobriety to negate the likelihood of harm. Ruby's recent treatment in Washington did not change her opinion. The expert witness indicated that the Tribe supported the children's placements — relatives in Juneau who have close contacts with one another — which allowed the children to grow up together and with family. She testified that even if Ruby's parental rights were terminated, tribal values would still support her having a close relationship with the children.

In June 2025 the superior court terminated Ruby's and Jaspar's parental rights. It found by clear and convincing evidence that the children were in need of aid due to abandonment, risk of physical harm, neglect, and substance abuse; that the parents failed to remedy their conduct; and that OCS provided active efforts to prevent the breakup of the Indian family. The court also found that the record established beyond a reasonable doubt that return of the children to the parents would likely result in serious emotional or physical damage to them. And the court found by a

preponderance of the evidence that termination of Ruby's and Jaspar's parental rights was in the children's best interests.[10]

Ruby and Jaspar appeal.

## III. STANDARD OF REVIEW

"The sufficiency of the state's 'active efforts' under ICWA presents a mixed question of law and fact,"[11] as does whether sufficient evidence "supports the [superior] court's conclusion that . . . [the] children would likely be seriously harmed if they were returned" to the parent.[12]

"We review de novo the superior court's conclusions of law, including the interpretation of ICWA and [Bureau of Indian Affairs] regulations."[13] Under a de novo standard, we "adopt the rule of law that is most persuasive in light of precedent, reason and policy."[14] "We review a superior court's findings of fact for clear error."[15] "Factual

---

**10** *See* AS 47.10.086 (Involuntary Termination of Parental Rights and Responsibilities); CINA Rule 18(c) (Burden of Proof); AS 47.10.011(1) (Abandonment), (6) (Physical Harm), (9) (Neglect), (10) (Substance Abuse).

**11** *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1019-20 (Alaska 2012).

**12** *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1008 (Alaska 2022) (quoting *J.A. v. State, Div. of Fam. & Youth Servs.*, 50 P.3d 395, 399 (Alaska 2002)).

**13** *Id.* (footnote omitted) (first citing *In re April S.*, 467 P.3d 1091, 1096 (Alaska 2020); and then citing *Kyle S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 1262, 1267 (Alaska 2013); *Oliver N. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 171, 177 & n.19 (Alaska 2019)).

**14** *Langdon v. Champion*, 752 P.2d 999, 1001 (Alaska 1988) (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1055 (Alaska 1987)).

**15** *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1070 (Alaska 2018) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 269 (Alaska 2011)).

findings are clearly erroneous if review of the entire record leaves us with a 'definite and firm conviction that a mistake has been made.' "[16]

Finally, best interests findings are factual findings reviewed for clear error.[17]

## IV. DISCUSSION

Both Ruby and Jaspar argue that the superior court erred in determining that OCS made active efforts to maintain or reunite the family. In addition, Ruby argues that the superior court erred in finding: (1) that returning custody of the children to the parents would likely result in serious emotional or physical damage to the children; and (2) that termination was in the children's best interests. We address their arguments in turn.

### A. The Superior Court Did Not Err In Determining That OCS Made Active Efforts.

Before terminating parental rights to an Indian child, the superior court must find by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[18] "Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[19] We view these efforts as a whole,

---

[16] *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1264 (Alaska 2014) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[17] *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 930 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[18] 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

[19] 25 C.F.R. § 23.2 (2026).

and because perfection is not required, minor failures by OCS will not undermine a finding that it made active efforts.[20]

There is "[n]o pat formula" to distinguish between active and passive efforts.[21] "Generally, active efforts will be found when OCS takes the client through the steps of the plan rather than requiring that the plan be performed on its own, but not when the client must develop his or her own resources towards bringing [the plan] to fruition."[22] "Although a parent's 'lack of effort does not excuse OCS's failure to make and demonstrate its efforts,' a court may consider a parent's 'demonstrated lack of willingness to participate' when evaluating active efforts."[23] "[D]ifferent behaviors, and motivations, require different adjustments from OCS," and a failure to adjust efforts in light of a parent's specific difficulties with engagement is a failure of active efforts.[24]

In appealing termination of their parental rights, both parents focus on this last component of active efforts, requiring efforts tailored to their unique circumstances. Although their precise arguments differ, they both seem to take issue with the efforts

---

**20**     *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 563 (Alaska 2022) (citing *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607-08 (Alaska 2021)); *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 478 (Alaska 2013) (citing *Pravat P.*, 249 P.3d 264 at 272 (Alaska 2011)).

**21**     *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)).

**22**     *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981 (Alaska 2019) (alteration in original) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)) (internal quotation marks omitted).

**23**     *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 902 (Alaska 2021) (footnote omitted) (first quoting *Bill S.*, 436 P.3d at 983; and then quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

**24**     *Mona J.*, 511 P.3d at 563-64.

made while they were completely out of contact with OCS. Both parents emphasize that the active efforts requirement is an "uncompromising standard," and argue that OCS therefore should have done something more than repeatedly attempt to contact them when they were absent and unresponsive. They suggest that their absence was proof that OCS's efforts were not responsive to their specific needs for engagement and therefore could not amount to active efforts.

At the outset, we note that even "[f]ailed attempts to contact the parent . . . may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[25] And OCS's attempts at contact cannot be deemed passive solely because parents have voluntarily absented themselves.[26] In such cases, active efforts can include "[c]onsidering alternative ways to address the needs of the Indian child's parents . . . if the optimum services do not exist or are not available."[27] With these principles in mind, we address the parents' respective arguments.

---

[25] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[26] Courts of other jurisdictions have come to similar conclusions about how efforts should be viewed when a parent is voluntarily absent. *See, e.g.*, *People ex rel. J.S.B., Jr.*, 691 N.W.2d 611, 620 (S.D. 2005) ("[The State] could not be required to provide remedial services and rehabilitative programs to an individual who had voluntarily absented himself and could not be located."); *In re William G.*, 107 Cal. Rptr. 2d 436, 439 (Cal. App. 2001) (holding multiple attempts over a year to notify parent of court proceedings sufficient to establish active efforts where parent "chose to make himself unavailable").

[27] 25 C.F.R. § 23.2 (2026).

## 1. Ruby's arguments do not reveal error in the superior court's active efforts determination.

Ruby argues that OCS's efforts were not "designed to . . . enable the [children's] safe return to the family home."[28]  But upon review of OCS's extensive history of efforts, we conclude that those efforts, considered together, were active and tailored to her family's unique circumstances.

As an initial matter, Ruby oversimplifies OCS's efforts during the time periods she was absent, describing those efforts as amounting to sending letters to addresses where she did not reside, and arguing that OCS put "only minimal effort into locating her."  Her minimization of the factual record avoids addressing the extensive evidence of efforts that were tailored to finding and engaging with each of the parents.  For example, in early 2023, after Jaspar told OCS that he and Ruby were returning to Juneau but then failed to follow up, their caseworker partnered with a Tlingit & Haida ICWA worker to drive around Juneau looking for them.  Then, when Ruby disengaged, the family's caseworker again met with the ICWA worker to identify ways to locate Ruby, and OCS held a similar meeting to generate leads and establish contact.  Two OCS workers sent frequent emails, texts, calls, and Facebook messages in addition to the letters that were sent to multiple addresses where she might be located.  They then searched multiple databases, including VINELink, PFD records, and a child-support-related database, to search for new points of contact and continued their efforts at getting a message through to her.  OCS responded to Ruby's absence by meaningfully searching for her in a number of ways and working toward Denver's and Celia's placement with family members in the meantime.  Ruby's argument that OCS's efforts during her prolonged absence were anything but intensive and thorough is therefore unavailing.

---

[28]  *Sylvia L.*, 343 P.3d at 432 (citing AS 47.10.086(a); AS 47.10.088(a)(3)).

Ruby next argues that OCS's efforts were deficient because once she began treatment in March 2025, her Juneau caseworker did not contact her or her Anchorage caseworker to case plan. But her Juneau caseworker testified about exchanging emails with Ruby in February and March. And he explained that although he did not reach out to Ruby in April because she was in treatment, he monitored OCS records showing engagement with her Anchorage caseworker. The permanency worker also messaged Ruby on Facebook during this period. We agree that efforts to directly connect with Ruby could have been stronger during this timeframe, but our review of an active efforts finding involves consideration of the entire history of efforts made by OCS.[29] OCS first engaged Ruby in urinalysis testing and visitation in 2022, at which point she attended some visitation but did not appear at her urinalysis testing, despite receiving assistance with transportation. OCS then collaborated with Ruby to create a case plan in February 2023, but lost contact in June when Ruby left treatment in Anchorage without notifying OCS. As described above, OCS made extensive efforts to locate and contact Ruby in the year and a half that followed. And finally, when OCS reestablished contact in 2025, the family's caseworker resumed case planning attempts.

We further observe that Ruby's arguments do not address the efforts OCS made to assist the children at the center of this case.[30] OCS provided visitation for both children, established paternity of Celia with DNA tests, coordinated dental care for Denver, and enrolled the children in school and pre-school programming. It found close

---

[29] *See Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 645-46 (Alaska 2013).

[30] *See* 25 C.F.R. § 23.2 ("Active efforts means . . . efforts intended primarily to maintain or reunite an Indian child with his or her family."); *see also A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 260 (Alaska 1999) ("[I]n a termination trial, the bests interests of the child, not those of the parents, are paramount."); *cf. Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 267 (Alaska 2019) (noting that services provided to children count in reasonable efforts analysis).

relative placements for the children so they not only had opportunities to be with family, but could also spend time together as siblings and remain available for visitation with their parents. And it assisted with the children's enrollment in their home Tribe.

Examining the full history of OCS's efforts toward the family, we disagree with Ruby's broad contention that OCS's efforts were not "designed to . . . enable the [children's] safe return to the family home."[31]

### 2. Jaspar's arguments do not reveal error in the superior court's active efforts determination.

Jaspar also argues that OCS failed to make active efforts early in the case, claiming that efforts to contact him did not begin until almost two years into the case. Similar to Ruby, he fails to acknowledge the bulk of OCS's efforts, and we conclude that OCS's efforts were active when viewed in their entirety.

We first observe that OCS began providing services to Jaspar well before the instant case, including helping him to overcome safety risks in his household in 2017 and responding when he overdosed on heroin in late 2019, shortly after Denver's birth.[32] Here, although OCS admitted at trial that case planning was not ideal in the beginning, it did refer Jaspar to a schedule of urinalyses and visitation in the months

---

[31] *Sylvia L.*, 343 P.3d at 432 (citing AS 47.10.086(a); AS 47.10.088(a)(3)).

[32] We do not decide here whether OCS's 2017 efforts, made before Denver was born, may directly support the superior court's active efforts determination at issue. We have previously said that "the determination of whether OCS may rely on active efforts made on behalf of older children in support of a petition to terminate parental rights as to a younger child, born after those efforts were made, is heavily fact dependent." *Sandy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 216 P.3d 1180, 1190 (Alaska 2009) (internal quotation marks omitted). But here, even assuming that OCS's 2017 efforts may not contribute directly to the court's determination of active efforts as to Denver and Celia, those prior efforts and the resolution of Jaspar's prior cases are relevant to Jaspar's claim at trial and on appeal that his eventual disengagement resulted from his belief that there was nothing he could do to reunite with his family. His previous successes in reuniting with his children undermine this explanation for his lack of engagement.

after removal. While Jaspar is correct that his caseworker did not develop a full case plan until about six months into the case, he referred to this caseworker as being "very involved" and to the caseworker's efforts as "a testament to how hard they work and how much they care about bringing our family back together." These efforts led to multiple meetings with Jaspar, his attorney, and the Tribe's ICWA worker, who all helped craft a responsive case plan. And pursuant to this plan, Jaspar attended inpatient substance abuse treatment in Juneau, although he was ultimately discharged for noncompliance with treatment center rules. OCS also supplied bus passes to make sure transportation was not an obstacle for Jaspar. His argument that insufficient early efforts led to his periods of disengagement and prolonged absences is therefore unpersuasive.

Regarding his absence for one or more periods of time, Jaspar argues that the particular efforts employed by OCS were not responsive to his homelessness, and thus not designed to fit his particular circumstances. But OCS's diligent pattern of communication — emailing, calling, texting, messaging, and sending letters; then searching for additional points of contact; then repeating — is just as relevant here as it is to Ruby. And OCS collaborated with the Tribe to post physical flyers in places where they hoped to make contact with Jaspar.[33]

Jaspar's argument about OCS's inability to engage him is more relevant to whether the efforts were actually successful than whether they were active and responsive to his specific noncooperation. We observe that OCS's efforts did wane at points, such as when the caseworker did not attempt to establish contact with Jaspar during the first two days of the termination trial despite their mutual attendance. But

---

[33]     Additionally, while Jaspar now criticizes OCS's sending of notices and information to him by email, he agreed early in the case that OCS could send information to his email address, and indeed, when he was asked during the termination trial to access and search his email inbox on his phone, he could see his caseworkers' frequent attempts to engage him.

the caseworker continued to email Jaspar after he confirmed access to that email address, and Jaspar never responded; nor did he attend the final day of trial. This flaw in OCS's efforts was not severe enough to undermine the superior court's ultimate determination that OCS's efforts, as a whole, were active.[34]

Jaspar analogizes his case to that of *Clark J. v. State, Department of Health & Social Services, Office of Children's Services*.[35] But although *Clark J.* is somewhat relevant given the involvement of a voluntary parental absence, it is not analogous. There a father avoided OCS for two years because the mother "had recommended against his involvement and because he was avoiding arrest."[36] Subsequently, the mother died and the father consented to guardianship of the children, after which OCS stopped attempting to contact the father during the two years before termination.[37] We noted there that OCS's efforts in the first two years were active — despite the father's avoidance, OCS worked with relatives and contacted law enforcement after learning of the father's arrest warrant — but that the failures in the subsequent two years were "so egregious that the efforts during the earlier period [could not] make up for it."[38] This is not the case here, where OCS successfully connected Jaspar with treatment, frequently attempted contact after his discharge and disappearance, and then continued attempts at contact during the five months of trial.

---

[34] *See Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 982-84 (Alaska 2019); *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 902-04 (Alaska 2021).

[35] 483 P.3d 896.

[36] *Id.* at 902.

[37] *Id.* at 898-99, 903.

[38] *Id.* at 902-04.

Thus, while the efforts extended to Jaspar were not perfect, OCS's efforts were active when viewed in their entirety.[39]

**B. The Superior Court Did Not Err In Finding That Ruby's Continued Custody Would Likely Result In Serious Harm To The Children.**

Before terminating parental rights, ICWA requires that a trial court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[40] Ruby argues that OCS failed to meet this standard here. To determine whether this standard is met, we have adopted a two-prong test requiring evidence that "(1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[41] Ruby generally argues that the expert's testimony — that the recency of her sobriety made it likely that relapse and harm would occur — is insufficient to meet the burden here.

Ruby's argument, however, appears in part to rely upon a misunderstanding or misstatement of the ICWA standard, as she contends that ICWA requires OCS to prove beyond a reasonable doubt that a parent *will* cause substantial harm to children if the children are returned to the parent's custody. But the superior court must find, beyond a reasonable doubt, that harm to the child is *likely* to result from a parent's custody, not that such harm is certain beyond a reasonable doubt.[42]

---

[39] *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 565-66 (Alaska 2022).

[40] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 431 (Alaska 2015) (omission in original) (quoting 25 U.S.C. § 1912(f); CINA Rule 18(c)(4)).

[41] *Diana P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 355 P.3d 541, 546 (Alaska 2015).

[42] 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

Ruby also contends that her recent sobriety and engagement with inpatient treatment made it unlikely that her custody of the children would harm them, even in the event of a relapse. But she ignores the court's reference to testimony about her extensive history of substance abuse.[43] This includes her own testimony about struggling with substance abuse for 20 years, OCS testimony about her exposure of both Denver and Celia to opioids in utero in 2019 and 2022, and the fact that in 2024, just before the start of Ruby's sobriety while in treatment, she exposed her youngest child to opioids in utero as well. We have recognized that "[t]he superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[44] We are thus unpersuaded by Ruby's argument that the superior court's later likelihood of harm finding was erroneous simply because the record also included some hope for Ruby's future recovery from addiction.[45]

Ruby finally asserts that we should give weight to the superior court's ruling in Ruby's youngest child's case, where it reportedly ordered the return of custody of D.D. due to a lack of safety threats. First, we note that we lack any information in our record about a release of custody of D.D. But even assuming Ruby's reports about that case are correct, such an outcome in that much more recent case does not undo the basis for the court's determination of risk in this matter. Ruby reports that one month after termination in this case, the same superior court allowed D.D. to return to Ruby's care while she continued to engage in her inpatient treatment program. But the question

---

[43]    The superior court is permitted to aggregate testimony from lay and expert witnesses in making this finding. *Sylvia L.*, 343 P.3d at 433 (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

[44]    *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003).

[45]    We also note that we have previously affirmed a finding of likelihood of harm under similar circumstances. *See Sandy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 216 P.3d 1180, 1192-93 (Alaska 2009).

here is not whether Ruby's *care* of Denver and Celia while in a structured setting would likely cause them harm, but whether Ruby's *custody* of these children would likely cause them harm.[46] Given Ruby's decades-long history of substance abuse, her relatively recent sobriety, and the lengthy period of time the children had spent in foster care, the superior court did not err by looking beyond Ruby's living situation at that moment to consider her risk of relapse in an uncontrolled setting and the harms that would pose to Denver and Celia. Additionally, Denver and Celia have distinct needs based on their ages and circumstances.[47] The needs of six-month-old D.D. are not the same as those of six-year-old Denver and nearly-three-year-old Celia. Finally, Ruby's argument fails to contend with any of the substantive evidence supporting the superior court's analysis of risk to Denver and Celia should they be returned to her custody. We therefore conclude that the court did not err in finding, beyond a reasonable doubt, that Ruby's continued custody of the children was likely to result in serious harm to them.

C. **The Superior Court Did Not Clearly Err In Finding That Termination Was In The Children's Best Interests.**

Before terminating parental rights, the superior court must find by a preponderance of evidence that termination is in the children's best interests.[48] Ruby argues that the court clearly erred in doing so here. Although the best interest factors to be considered for this finding are not explicitly defined in statute or rule, consideration of a child's best interests may include examining the likelihood of returning the child to the parent within a reasonable time based on the child's age or

---

[46] *Sylvia L.*, 343 P.3d at 431 (quoting 25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4)).

[47] *See A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1165-66 (Alaska 2000) (affirming finding of likelihood of harm from custody based in part on children's specific ages and circumstances); *cf.* AS 47.10.088(b)(1) (providing that for purposes of best interests, court may consider "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs").

[48] AS 47.10.088(c); CINA R. 18(c)(3).

needs, the amount of effort put in by the parent to remedy the conduct at issue, the harm to the child, the likelihood that harm will continue, and the history of the parent's conduct.[49]

The superior court focused on the timeline of any potential reunification and the likelihood of relapse and related harm to the children in finding termination to be in their best interests. Ruby says these findings were erroneous because her ongoing treatment indicated that she may achieve reunification in the near future. But the court highlighted that the children had been in custody for almost three years at that time, and that more time would be unreasonable given their needs.[50]

Ruby argues that we should heavily weigh her recent engagement with treatment in considering the best interests of the children. While we commend Ruby's progress and engagement, her claim that such engagement undermines the superior court's best interests finding is without support in the record. Indeed, the record illustrates that the children were in OCS custody for about three years, that Ruby dropped out of contact for about a year and a half of that time while still using substances, and that she had only very recently engaged with treatment and would, by her own admission, require more time before she could resume custody of the children. On this record, we cannot say that the superior court was wrong to prioritize Denver and Celia's permanency and find that their best interests required termination of Ruby's parental rights.

## V.     CONCLUSION

For the above reasons, we AFFIRM the superior court's termination order.

---

[49]     *Thea G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 291 P.3d 957, 966 (Alaska 2013), *abrogated on other grounds by*, State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A., 513 P.3d 999 (Alaska 2022).

[50]     *See Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1107-08 (Alaska 2011).